### HUMPHREYS OIL CO. v. LILES et al.
### (No. 4.)

(Court of Civil Appeals of Texas. Waco. April 24, 1924. Rehearing Denied June 12, 1924.)

1. Trial ⏅352(4)—Submission of issue as to oil escaping through defendant's wrongful act held proper.

In action to recover damages for oil pumped off of surface of creek and for oil permitted to escape from land by defendant's unlawful destruction of floating dams, held, that trial court did not go beyond scope of pleadings in submitting separate issues as to amount of damages from oil pumped by defendant directly from stream and damages for oil permitted to escape by destruction of dams.

2. Trial ⏅350(3)—Evidence held sufficient to justify submission of issues of number of barrels of oil escaping.

In action for damages for destruction of floating dams used to impound fugitive oil, evidence held to justify submitting issue of number of barrels of oil which plaintiff would and could have impounded if defendant had not destroyed dams.

3. Mines and minerals ⏅73—Lessee not entitled to waste oil coming down creek from other lands.

Lessee in oil lease was not entitled to waste oil coming onto leased land by way of a creek from other land unless granted by terms of lease, but right to capture such oil remained in owner of fee.

4. Appeal and error ⏅930(3)—Assumed question not submitted to jury decided in favor of judgment.

Where issue was not submitted to jury and no request was made for its submission, it will be presumed that court found on issue so as to support judgment.

---

⏅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**5. Nuisance ⬅══20—Justification for abatement by act of person.**

When a person seeks to justify his action in entering upon premises of another and forcibly destroying his property or depriving him of his property rights, under a claim of lawful abatement of nuisance, it must appear that such nuisance actually existed, and that such nuisance was purpose of his action, that all his acts in premises were reasonably necessary to effect such abatement, and that he was himself without fault.

**6. Mines and minerals ⬅══81—Lessee could not tear out floating dams of another on premises on ground they interfered with rights where real purpose was to capture fugitive oils of another.**

Lessee with right to drill for oil could not justify action in tearing out floating dams of another lessee on premises having right to capture fugitive oils by claim that dams interfered with drilling, where real purpose of tearing out dams was to itself capture fugitive oil by dams on a lower tract.

**7. Mines and minerals ⬅══81—Recovery properly permitted for value of abandoned oil that would have been captured if defendant had not destroyed floating dams.**

Where defendant destroyed floating dams which plaintiffs were entitled to maintain on tract of land to catch abandoned oil, on theory of trespass plaintiffs were entitled to recover value of oil which they would have captured if defendants had not destroyed dam, as against defendants' contention that no title vested in oil until it was seized and subjected to actual physical control.

**8. Mines and minerals ⬅══81—Loss of oil from well held not to warrant lessee in tearing out dams of others having right to capture fugitive oil on such lands.**

Fact that lessee entitled to drill for oil lost oil from well brought in did not warrant it in destroying dams of others on same tract of land having right to capture fugitive oils in creek flowing from other tracts or in taking all oil coming down stream.

**9. Appeal and error ⬅══742(5)—Error in instruction not complained of not subject to review.**

Omissions from instructions not complained of in any of propositions submitted in appellant's brief cannot be considered on review.

Appeal from District Court, Limestone County; A. M. Blackmon, Judge.

Action by Mrs. Lizzie Liles and others against the Humphreys Oil Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

C. S. Bradley, of Groesbeck, and Vinson, Elkins, Wood & Sweeton, of Houston, for appellant.

H. B. Daviss, of Corsicana, for appellees.

GALLAGHER, C. J. This appeal is prosecuted by the Humphreys Oil Company from a judgment against it for the sum of $30,690 in favor of Mrs. Lizzie Liles Windsor, R. H. Windsor, Altus Liles, R. H. Brazeal, C. H. Norman, and J. F. Nabors. Mrs. Lizzie Liles Windsor and her minor son, for whom she was the duly qualified and acting guardian, owned 144 acres of land. Eighteen acres of said tract were under an oil and gas lease owned by appellant. Plummer's creek, a small ravine, entered said 18-acre tract on its north line, ran through the same, and into the Kollman tract immediately south. This ravine was comparatively narrow, and water ran in the same continually during all the time the matters involved in this suit were transpiring. Plummer's creek drained a large area north of said 18-acre tract. There was situated in said area at the time a large number of producing oil wells. Some of these wells were on property belonging to Mrs. Windsor and Altus Liles, but none of them belonged to appellant. A large amount of waste or fugitive oil escaped from the many wells situated north of said 18-acre tract in the area drained by said creek. This waste or fugitive oil in large quantities flowed on the waters of said creek into and through said 18-acre tract. Mrs. Liles, before her marriage to appellee Windsor, acting for herself and as guardian for Altus Liles, entered into a lease contract with the other appellees above named, giving them the right to enter upon and occupy a part of said 18-acre tract, including said creek, for the purpose of impounding, recovering, and marketing such waste oil, subject to the rights held by appellant under its lease. The proceeds of said enterprise were to be shared by all the above-named appellees.

Appellees prepared an earthen reservoir of large capacity, and also procured and located certain wooden and steel storage tanks convenient for use in holding and storing oil recovered from said creek until they could market the same. They also extended a plank across said creek from bank to bank, placing the same so that the lower side thereof would be below the oil line in the flow of said creek, but so that it would not materially interfere with the lower stratum of water in such flow. This device is called in the record a floating dam. The effect of it was to hold the oil and make it accumulate on the surface of the water above said plank or dam while the water continued to flow beneath the same. They also installed pumps and began to pump the oil so stopped or impounded by said floating dam into their reservoir and tanks, from which they marketed the same. They had been so engaged about three days when appellant placed a pump near said dam and began to pump the oil so stopped and impounded into its own tanks. After a few days of such pumping appellant moved its pump and located the

same further up the creek, but still on said 18-acre tract. From that and other positions on the upper part of said tract it continued to pump such waste and fugitive oil from said creek into its tanks and reservoirs, and appropriated all the same to its own use. Appellant also erected a line of posts across the only outlet from appellees' said reservoirs and tanks to the public highway. The posts in said line were set so near together that wagons could not pass between them, and were as effectual as a fence would have been in preventing ingress and egress to and from appellees' reservoirs and tanks. In addition to pumping oil from said creek appellant, over the protest of appellees, from time to time destroyed their said floating dams and permitted the oil stopped and impounded thereby to flow on through said 18-acre tract into said Kollman tract. Appellees continually rebuilt such floating dams, and appellant continually destroyed the same, according to certain witnesses, as many as 30 times, extending over a period of several weeks. As a result of such interference appellees were practically defeated in their purpose to pump such oil from said creek into their reservoirs and tanks and to market the same, as they were doing before such interference, and as they would have continued to do had they not been so interfered with. All the waste oil in said creek which was not taken up and appropriated by appellant's pumps was by the repeated and continued destruction of said dams caused to flow on down said creek into said Kollman tract, which was controlled by appellant. Upon said Kollman tract, a very short distance from the south line of said 18-acre tract, appellant located and operated dams and pumps, by means of which it stopped and impounded and appropriated all the waste oil in said creek which reached that point.

The case was tried before a jury on special issues. Such issues and the answers of the jury thereto are as follows:

"Question No. 1. How many barrels, if any, of the oil that has heretofore been impounded by plaintiffs on the Liles lease, excluding therefrom such oil, if any, as may have originated from any well or wells belonging to the Humphreys Oil Company, did the defendant, Humphreys Oil Company, or its agents acting under instructions from said company, take or pump away? Answer: 5,400 barrels.

"Question No. 2. How many barrels, if any, of the oil that could and would have been impounded by the plaintiffs upon the Liles lease, were caused to escape and flow down Plummer's creek by the act of the defendant, Humphreys Oil Company, and its agents in removing and destroying the floating dam or dams erected on said creek by the plaintiffs for the purpose of impounding oil? Answer: 22,500 barrels.

"Question No. 3. What was the value of the oil inquired about in the two preceding questions at the time same was taken, if you find same was taken by defendant, Humphreys Oil Company, or at the time same was allowed to

escape, if you have answered that any did escape? Answer in the aggregate. Answer: $1.10 per barrel.

Based on said verdict, the court entered the judgment presented for review by this appeal.

The first proposition submitted by appellant as ground for reversal of the judgment complained of is as follows:

"The court submitted to the jury as question No. 2 the inquiry as to how many barrels of oil that could and would have been impounded by the plaintiffs were caused to escape and flow down Plummer's creek by the action of the defendant, Humphreys Oil Company, in removing and destroying the floating dam or dams erected on said creek by the plaintiffs for the purpose of impounding oil, and there are no allegations in plaintiff's petition to support such a charge, and since the major portion of the verdict of the jury is based upon the findings in answer to this question error has been committed, because it is not permissible for the court to charge on a matter outside of a case as made by the pleadings, and upon which the verdict might have been rendered."

[1] Appellees' petition covers 20 pages of the transcript. Many of the matters complained of therein are alleged in elaborate detail and with considerable repetition. The substance of the cause of action pleaded by appellees is that they had the right to use and occupy said part of said tract, including said creek, and the right to stop and impound therein and recover therefrom the waste and fugitive oil floating on the surface of the waters thereof, subject only to the rights of appellant under said lease held by it, and that such rights did not include any right to the use of said tract or said creek for the purpose of stopping and impounding such oil and taking and appropriating the same; that appellees had at considerable expense prepared, procured, and installed their dams, reservoirs, tanks, and pumps, and were actually successfully and profitably impounding, recovering, storing, and marketing such waste oil; that appellant by the alleged unlawful acts complained of prevented them from exercising such rights and purposes in the premises, and completely destroyed their said business, and deprived them of the benefit and profits of the same; that the right to so pursue said enterprise of recovering and marketing such waste oil was a very valuable one, being worth many thousands of dollars; and that appellants unlawfully seized and appropriated all of said oil and the benefits arising from recovering and marketing the same to its own use. Appellees' allegations concerning the amount of their damage, upon which the trial court apparently predicated the measure of their recovery, are not as clear and distinct as they might be, and we take it that their vagueness is the basis of appellant's complaint. Such allegations are too long to copy literally. So far as they bear

directly on the issues upon which said proposition is based, they are contained in several separate paragraphs of appellees' petition. Said allegations show in substance that the amount of such waste oil coming down said creek was sufficiently large to enable them at and prior to the time their business was so interrupted and destroyed to recover and take from said creek from 500 to 1,000 barrels of oil a day, and that such oil was worth $1.50 per barrel; that appellant pumped from oil so stopped and impounded by appellees 50,000 barrels, of the value of $75,000; that all the waste oil which appellant by the acts complained of caused to escape from and pass through appellees' said floating retaining dams was in fact collected by appellant at its dams and pumping station immediately below on the Kollman tract, and converted and sold by it; that appellant appropriated and converted all the waste oil in the creek so flowing through said tract of land; that the waste oil unlawfully and wrongfully taken by appellant from said tract from March 4, 1922, to the filing of said amended petition aggregated 50,000 barrels or more, of the value of $75,000. Appellees in their prayer, however, only sought recovery for one item of $75,000, and appellant insists that this should be applied to the allegation of the amount of stored or impounded oil charged to have been taken, to the exclusion of the allegations in appellees' petition that appellant by the destruction of their dams caused large quantities of oil stopped and impounded thereby in said stream to flow down to its station on the Kollman lease, where it was appropriated by appellant, and to the exclusion of the allegation just recited concerning the amount of waste oil alleged to have been wrongfully taken by appellant from the whole tract. We think appellees' prayer for the recovery of the sum of $75,000 is equally as applicable to the latter allegations as to the former, and, in the absence of a special exception, sufficiently specific to support a recovery on either or both such allegations. It is true appellees in no place allege in specific terms the exact amount of oil caused to flow through the floating dams so erected by them by reason of the destruction of such dams by appellant, but all such oil was included in its general allegations. The trial court submitting issues as a basis for measuring appellees' damages saw fit to segregate this class of oil from the oil pumped by appellant directly from appellees' impounded oil, and to invoke a finding by the jury as to the amount thereof. We cannot say that such action on the part of the trial court was beyond the scope of the case presented as a whole by appellees' pleadings, nor that such action is without support therein, and appellant's first proposition is therefore overruled.

[2] Appellant by its second and seventh propositions contends that the evidence was insufficient to justify the court in submitting the issue of the number of barrels of oil which appellees could and would have impounded upon said tract, but which were caused to escape and flow down said creek by the acts of appellant in destroying appellees' said dams, and that the verdict of the jury fixing such number of barrels at 22,500 is without support in the evidence. The testimony showed that the acts of appellant complained of extended over a period of four to six weeks or longer; that appellees in two days before they were interfered with by appellant pumped from said creek about 1,900 barrels of oil; that from 400 to 800 barrels of oil came down that creek daily, and that a conservative estimate of the amount of oil taken therefrom by appellant, including the amount taken at the dams and pumps on the Kollman lease just below the south line of said 18-acre tract, would be 50,000 barrels. There was also evidence that the acts of appellant so effectually excluded appellees from any opportunity to impound said oil and recover the same from the waters of said creek that they were compelled to abandon the undertaking. The evidence was sufficient to justify the submission of such issue and to sustain the verdict of the jury thereon, and said propositions are therefore overruled.

Appellant by appropriate propositions submitted in its brief contends that its action in continually destroying appellees' floating dams was justified by the provisions of its own lease and by the restrictions contained in appellees' lease, and in this connection claims that the effect of such floating dams was to back up oil and water in said creek and make the same stand upon the lowlands along the banks thereof, in which lowlands appellant was drilling and finally brought in a producing oil well, and that such standing oil and water constituted an invasion of its rights and a nuisance in law such as justified it in summarily abating the same by its own acts.

Appellant's lease in terms granted all the oil and other minerals in and under the land, together with ingress and egress for the purpose of drilling and operating such wells, and the right to conduct all operations and lay all pipe necessary for the production and transportation of oil.

Appellees' lease in terms granted the right to establish and maintain a waste oil station and to construct tanks, floating dams, and pump stations, and to save and take care of all waste oil from said tract. The rights granted by appellees' lease were expressly restricted to surface rights only, to the construction of floating dams in said creek, and to placing tanks and equipment necessary to save and take care of any waste oil taken therefrom, and lessees expressly agreed not to interfere with the rights of the owner of appellant's lease, and at the request of such

owner to remove any structure placed on said land which interfered with such rights.

[3] Appellant's lease did not grant any right to take and appropriate waste oil coming into said creek above said tract of land and running with the waters thereof through said tract, nor to use and occupy said creek or the surface of said tract for any such purpose. Not having been granted by the terms of the lease held by appellant, such rights remained in the owner of the fee and passed by the lease held and owned by appellees. The right to take from said creek waste oil flowing into the same from the area above said 18-acre tract and to appropriate the same was not in any way incident to the business of drilling and operating wells for the production of oil in and under said tract of land, nor to the laying of pipe incident to the production of such oil and the transportation thereof.

Appellant further contends that the land immediately surrounding its said oil well was low and boggy, and that appellees' floating dams impaired the drainage thereof and caused water, slush, and oil to stand around said well so as to materially interfere with the drilling and subsequent operation of such well.

Appellees' lease covered all the bed of Plummer's creek and that part of the 18-acre tract west of the same. This part was comparatively small, extending from the middle of the west line to the northwest corner of the tract. Appellees' floating dam and pumping station were constructed in a horseshoe bend of said creek about the middle of said lease. Appellant's said well, known as Clark 7, was located on the east side of the creek some 200 or 300 feet north of appellees' station. In addition to the said well on Plummer's creek appellant had a well known as Clark 8 about 500 feet northeast and another well known as Clark 9 about 600 feet southeast of well 7. Appellant had no well west of said creek. The evidence shows one or more interviews between appellees and appellant's manager in an attempt to adjust the difference between them, and that in such interviews practically the only complaint advanced or insisted on by said manager was that the acts of appellees in the premises in setting up an engine and boiler to run their pump and in stopping oil in the creek increased the fire hazard at said well 7. No such issue was raised by its pleadings or urged therein as justification for the acts complained of by appellees. Appellant maintained and operated an engine and boiler on its side of the creek in close proximity to said well, which also constituted a fire hazard. Appellant's said manager also testified that he ordered said creek cleaned out and kept clean to afford drainage for the territory surrounding well 7, and that such action was necessary. He did not specifically claim that water or oil stopped by said floating dam overflowed the channel of the creek and stood around said well. He testified that well 7 was brought in about March 10th. Another witness testified for appellant that they did not adopt any particular construction at well 7 until after it was brought in; that they then decided to build a steel rig with concrete floor; that they did this because the ground there was low; that they also cleaned out the brush and obstructions to get the waste water and stuff out of the way, and that they cleaned said creek all the way from the Kollman lease up to well 7. This witness also testified that the land between well 7 and well 9 was almost impassable. This witness also testified that appellees' dam consisted of a plank 1x8 or 1x12 extended across the creek and held at the ends with dirt. He also testified that if a freshet should come down the stream said so-called dam would back oil and water up the creek, but that if a freshet came such dam would be washed away. He did not say that the dam in fact caused water or oil to back up around said well 7. There was testimony that appellant cut a ditch from the neighborhood of well 7 down to the Kollman lease and into Plummer's creek thereon. This ditch was east of Plummer's creek, but its exact location is not shown, nor does it appear just when such ditch was cut. Another witness testified for appellant that he was a teamster hauling material to well 7 on the 4th of March, and that conditions were very bad all through there and around said well; that he quit work that night on account of such conditions, but returned to work on the 6th of March and the conditions were very greatly improved. He attributed such improvement to ditches cut by appellant which drained the water away. The testimony shows that appellant began on the 4th of March to pump the oil stopped in said creek by appellees' dam, and continued such operation day and night for three days. This indicates that the destruction of appellees' dams did not begin earlier than March 7th, and that the ditching referred to by the last-mentioned witness which so greatly improved the conditions on the east side of the creek around said well 7 must have been the said ditch east of Plummer's creek. We are not cited to any evidence of conditions around well 7 after March 6th.

Appellees introduced testimony that the floating dams erected by them from time to time and constantly removed and destroyed by appellant's employees for the space of six weeks or longer did not at any time impede the flow of the water, ample space therefor being left open under such dams, and that the same merely stopped and held the oil on top of the water of the creek. They also introduced evidence showing that the oil so stopped was never sufficient to overflow the banks of the creek.

Appellant requested the court to submit the following special issue, which request the court refused:

"Did the erection and maintenance of such structures or obstruction as plaintiffs erected or maintained in Plummer's creek in March, 1922, interfere with the rights of defendant in any way, as to the owner of the mineral lease upon said land in their operation of said lease? In this connection, you are instructed that defendant, Humphreys Oil Company, had an oil, gas, and mineral lease upon said tract of land conveying the oil and gas in and under said tract of land, together with the right of ingress at all times for the purpose of drilling and operating for oil and gas and of conducting all operations and laying all pipes necessary for the production thereof. This question you will answer 'Yes' or 'No.' "

Waiving any question as to the sufficiency of an affirmative finding by the jury in answer to such issue to establish that such interference, if any, was material and constituted a nuisance, and that such nuisance would have existed and continued during the six weeks or more that appellant continuously destroyed appellees' dams but for such destruction, we will consider whether the submission of the same and an affirmative answer thereto by the jury would have authorized or required a different judgment from that rendered by the court in this cause. The evidence shows practically without dispute that appellant first availed itself of the effect of said dam by placing a pump on said creek above the same and for the space of three days running such pump day and night, pumping the oil so stopped and held on the surface of the creek into its own tanks and receptacles, and that it did not interfere with appellees' dam while so engaged; that by such action it secured and appropriated approximately 6,000 barrels of oil so stopped in said creek; that after operating at such place in such manner for said space of time it moved said pump further up said creek on said 18-acre tract, and operated the same continuously, pumping oil from said creek; that it constructed a dam on or across said creek to increase the efficiency of such pumping plant; that it began to tear out and destroy appellees' dams about the time it moved its pump up the creek. Appellant's manager testified that he gave instructions to his employees to pick up everything possible in the way of waste oil found on that tract of land, and that they paid no attention to where such oil came from, and that the waste oil from at least a dozen leases above drained into that creek. The evidence also showed without dispute that when appellant's employees tore out appellee's dams all the oil not picked up by appellant's pump above flowed on down the creek a few hundred feet out of the 18-acre tract and into the Kollman tract to appellant's pickup station there situated, where it was all taken and appropriated by appellant. .

[4] The evidence is sufficient to sustain a finding by the court that appellant's action in pumping from said creek oil which flowed into the same from the area above was an invasion of appellees' rights under their lease and a trespass upon their possession; that the purpose and effect of such action was to seize and appropriate oil on the waters of said creek which appellees, by reason of their lease and possession of said creek thereunder, had a right to seize and appropriate, and which appellant had no right to seize and appropriate; that appellant continued such action during the whole period involved in this controversy; that appellant's action in continuously tearing out appellees' dams materially aided it in accomplishing the seizure and appropriation of all of such oil, and that it so intended; that the destruction of such dams was incidental to and part and parcel of a purpose on the part of appellant to prevent appellees from seizing and appropriating any of the waste oil coming down said creek from the lands above, and to prevent them from enjoying the benefits resulting therefrom, and to enable appellant through its agents and employees to seize and appropriate all such oil by causing such oil as passed its pumping station above to flow on through said creek past appellees' pumping station, into the Kollman lease below, where the same, and all the same was picked up and appropriated by appellant. There was no request for the submission of such issue to the jury nor for the submission of any other issue raised by such evidence. In the absence of such request we are required to presume that the trial court so found.

Where the law allows a person to maintain his own rights by force and violence upon the person or property of another, it exercises a watchful care to see that such high privilege is not abused. In case of violence to the person of another the statute carefully enumerates the several instances where the same is permitted, and then provides that in all cases where violence is permitted to effect a lawful purpose only that degree of force may be used which is necessary to effect such purpose. Penal Code, arts. 1014 and 1015. To justify a person in inflicting violent injury to the person of another on the ground of necessary defense of his own person or property it must appear not only that such violence was necessary, but also that no more force was used than was reasonably necessary to secure or assure such protection. Such right originates in necessity and is limited thereby. If the violence is excessive, supposed necessity affords no justification. Cotton v. State, 4 Tex. 260; Stockton v. State, 25 Tex. 772.

The law with reference to an entry upon another's possession of property is thus stated in 26 R. C. L. p. 943, § 18:

"The rule is well established that where an authority given by law is exceeded the party loses the benefit of his justification, and the law considers him a trespasser ab initio, although to a certain extent he followed the authority given. The law will operate retrospectively to defeat all acts thus done under color of lawful authority, when exceeded, and a fortiori will it operate retrospectively to prevent the acquisition of any lawful right by the excess and abuse of authority given for useful and beneficial purposes."

After citing instances of abuses by officers after levy of lawful process, and the effect of such abuses, the text continues:

"The same doctrine extends to private citizens acting under authority of law. Hence a person becomes a trespasser ab initio where he enters an inn lawfully if, after entry, he commits an assault on the owner or trespass on his property; or where he takes up an estray and uses it, not as a matter of necessity and for the benefit of the owner, but for his own benefit; or where, having a right to remove a trespasser's goods from his premises, he abuses his authority."

The rule in such cases is stated in 38 Cyc. p. 1000, as follows:

"The general rule is laid down that where an entry is made or possession of property taken by authority of law which would be a trespass but for such authority, a subsequent abuse of the authority renders the doer a trespasser ab initio, and is applied to a mere failure to fulfill the conditions attached to the exercise of the right."

The following instances of the application of such rule are cited in the notes to said text:

"A street commissioner is a trespasser ab initio if after rightful removal of plaintiff's shop he sells it (Mussey v. Cahoon, 34 Me. 74); * * * or one who, cutting grass in a highway lawfully, thereafter feeds it to his horse (Cole v. Drew, 44 Vt. 49, 8 Am. Rep. 363); * * * or entry under search warrant by an officer to obtain evidence, not to search for goods (Lawton v. Cardell, 22 Vt. 524); * * * or conversion of mill dam materials after its lawful destruction (Little v. Ince, 3 U. C. C. P. 528), renders one a trespasser ab initio. * * * So, working an animal seized under attachment renders both the creditor who does it and the constable trespassers ab initio. Lamb v. Day, 8 Vt. 407, 30 Am. Dec. 479. * * * So, a purchaser at judicial sale of goods in a vessel who moves the vessel to a more convenient place for their removal is a trespasser ab initio. Bear v. Harris, 118 N. C. 476, 24 S. E. 364."

Mr. Joyce, in his Law of Nuisances, § 374, states some of the limitations on the right of summary abatement of a nuisance by the action of the party aggrieved as follows:

"The right of an individual to summarily abate is also held to exist in the case of a private nuisance by which he sustains an injury, and entry for the purpose of abatement is declared to be justifiable. It is essential, however, to entitle one to abate a private nuisance that he suffer some injury theretrom, as a nuisance of this character can only be summarily abated by one who is injured by it. And the exercise of this right is also subject to the limitation that the danger must be imminent in order to authorize a private individual to take the execution of the law into his own hands, for where there is time and opportunity for the interposition of an adequate legal remedy, which may be effectual, the law will not justify a summary resort to force. The nuisance must also be one which injures the individual at the time of its abatement."

We quote from 2 Wood on Nuisances, p. 1287, as follows:

"Enough has been said to illustrate the general doctrine of abatement by the act of the party injured. But it is proper to say that this remedy is a dangerous one, and one which should never be resorted to except in extreme cases, when the exigencies of the case will not brook delay. The law generally affords ample redress for all injuries, and if no verdict declaring the thing to be a nuisance can be obtained, no justification for its removal can be upheld. The party judges at his peril, and if he errs in judgment he is answerable for all the damages that ensue, and, if, in the exercise of the right, a breach of the peace is involved, he is answerable by indictment for the result. Therefore, generally, it is unsafe to advise a party to remove a nuisance himself, at least if the nuisance is not beyond doubt, and the removal confined within the limits of actual right."

[5, 6] We think that when a person seeks to justify his action in entering upon premises in the possession of another and forcibly destroying his property or depriving him of his property rights, under a claim of the lawful abatement of a nuisance, it must reasonably appear that a nuisance actually existed, that the abatement of such nuisance was the purpose of his action, that all his acts in the premises were reasonably necessary to effect such abatement, and that he was himself without fault in the premises. 29 Cyc. pp. 1190, 1217, and 1233; Gates v. Blincoe, 2 Dana, 158, 26 Am. Dec. 440, and note; Topeka Water Supply Co. v. Potwin Place, 43 Kan. 404, 23 Pac. 578.

We have found no case where a party made a forcible entry on the possession of another for an unlawful purpose, and in the course of the continued prosecution of such purpose, and to more effectively accomplish the same, forcibly destroyed the property of such other person, and sought to justify his acts on the ground of legal right to abate a nuisance. We conclude by analogy, however, from the authorities above quoted, that to justify an entry upon the possession of another and the destruction of his property under claim of summary abatement of a nuisance such action must not be part or parcel of nor directly associated with any unlawful purpose or action. For the reasons above set out, we are of the opinion that if the court

had submitted such issue as requested, and the jury had answered the same in the affirmative, such finding would not have of itself justified or required a different judgment from that rendered by the trial court in this case. Appellant's said propositions are therefore overruled.

[7] Appellant by appropriate propositions submitted in its brief contends that the oil coming down Plummer's creek through said 18-acre tract from the area above the same was in the nature of abandoned property, in that it had escaped from its owners and such owners had not seen fit to attempt to pursue and retake the same; that as abandoned property it was subject to seizure and appropriation by the first taker; that the title thereto vested in such taker only when he had seized and subjected same to actual physical control, and that, if appellees had any actionable interest in any of said waste oil flowing in said creek, it was only in such of said oil, if any, as they had taken and held in actual possession.

The principal application of these contentions to the facts of this case made by appellant is to the recovery by appellees of the value of the oil which the jury found they could and would have impounded but for the acts of appellant in removing and destroying the floating dams erected by them, and by such removal and destruction causing such oil to escape and flow down the creek. The evidence showed that waste oil in large quantities came into said creek from the territory north of said tract and flowed on with the waters of said creek through the same; that such oil came from a dozen or more different leases situated in the area above drained by said creek. There was no contention that any of the owners of leases in said area were then asserting or had ever asserted any title or ownership in such oil. There was no request for the submission to the jury of the issue of abandonment. There is evidence sufficient to sustain a finding that said oil was abandoned oil and subject to appropriation. 1 C. J. pp. 11 and 12; 1 R. C. L. p. 5, § 7; Dark v. Johnston, 55 Pa. 164, 93 Am. Dec. 732; Duvall v. White, 46 Cal. App. 305, 189 Pac. 324 In deference to the judgment we are required to presume that the court did so find.

Title to abandoned property vests in the first taker who reduces the same to possession. Huggins v. Reynolds, 51 Tex. Civ. App. 504, 112 S. W. 116; 1 C. J. 13.

We understand that the second issue submitted by the court covers only such oil as appellees had never stopped or impounded by their dams, but which they could and would have stopped and impounded thereby if they had been permitted to maintain the same. We do not think that the mere fact that appellees had a right to use and control said creek for the purpose of stopping oil therein and taking the same therefrom constituted such possession of the oil flowing on and with the waters of the same which they had never stopped nor impounded therein as to invest them with title to such oil as takers of abandoned property. But we do not think appellees' recovery in response to such finding is strictly a recovery for conversion of property to which appellees held title. We think the real basis of the right to recover on that issue is that said abandoned oil was continually flowing down said creek through a portion of the same in possession of appellees, and which they had a lawful right to control for the express purpose of stopping such oil therein and taking the same therefrom; that they had prepared, provided, and installed effective means for stopping such oil, taking the same from the flow of said creek and storing the same in tanks and reservoirs for sale and delivery to purchasers; that they were actually, successfully, and profitably engaged in said enterprise; that they were by the invasion of their possession and the destruction of their said dams prevented from continuing said enterprise, and were thereby compelled to abandon the same; that such invasion of their possession and destruction of their dams was unlawful and constituted a trespass; that they suffered great damage as a direct and proximate result of said unlawful acts of appellant's agents and servants, and that such damage could be properly measured by the value of the oil which appellees could and would in the prosecution of such enterprise have impounded and taken from said creek and appropriated but for the destruction of their said dams. We think that appellees' pleadings in this case and the evidence submitted on the trial thereof are sufficient to support such findings by the trial court, and that we are required to presume that the court did so find. Appellant's propositions so far as applicable to such theory of this branch of the case are overruled.

[8, 9] Appellant at some time during the period covered by the controversy herein brought in a well on said 18-acre tract very close to the west bank of said creek. It contends that a large amount of the oil produced by said well escaped into said creek, and that it had a right to retake the same, and that appellees had no right to take or appropriate the same. Whether any material amount of oil from appellant's well flowed into said creek was a contested issue. The evidence did show, however, that a great majority of the oil on the waters of said creek came from the area above said tract. After the first three or four days appellant located its pump above said well and operated the same above the same continually thereafter. Appellant's general manager testified that he gave instructions to his employees to pick up everything possible in the way of waste oil found on that tract of land, and that they paid no attention to where such oil came from. He also testified that their ac-

tion in picking up such waste oil was like "picking up a maverick." Just what rights appellant had by reason of its contention that some waste oil escaped from its said well and mingled with the oil and water in said creek below the same we do not find it necessary to determine. Appellant's lease gave it authority to lay pipe for the transportation of oil, but there is nothing whatever said in such lease about using the waters of said creek for the transportation of oil. If some waste oil did escape from its well and flow upon and mingle with the waters of such creek, such fact did not give appellant any right to all the oil in the creek, nor any right to exclude appellees entirely therefrom, nor any right to destroy their dams so as to prevent appellees from appropriating any part of the same and to enable it at its pickup station immediately below to seize and appropriate the whole of the same. Duvall v. White, supra. The court in submitting the first issue required the jury to exclude from their finding all oil originating from any well or wells belonging to appellant. The failure of the court to so exclude such oil, if any, as came from appellant's wells, in submitting the second issue, is not complained of in any of the propositions submitted in appellant's brief, and is therefore not subject to review by this court.

We have reached the conclusion that the judgment of the trial court should be affirmed; and it is so ordered.