## GRAYBURG OIL CO. et al. v. STATE et al.
### No. 7686.

Court of Civil Appeals of Texas. Austin.
April 20, 1932.

Rehearing Denied May 11, 1932.

James Cornell, of San Angelo, and Kampmann & Burney and Ingrum & Smith, all of San Antonio, for appellants.

James V. Allred, Atty. Gen., and F. O. McKinsey and R. W. Yarborough, Asst. Attys. Gen., for the State.

Collins, Jackson & Snodgrass, of San Angelo, for appellees P. L. Childress et al.

BAUGH, J.

The sole question in this case is whether or not appellants are due to appellees royalties on seepage oil produced from a river bed lease of the Pecos river in Crocket and Pecos counties, Tex. The trial was to the court without a jury, and judgment rendered in favor of appellees for such royalties; hence this appeal.

On January 13, 1927, the Commissioner of the General Land Office issued to seventeen named parties a permit to mine, drill, and operate for oil and gas, in a designated portion of the Pecos river bed; said permit providing for payment of one-eighth royalty

to the state. This permit was assigned by these permittees to Allsman & Bell, who agreed to develop the premises and pay to said permittees one-fourth of all oil and gas produced. The property was developed by Allsman & Bell and an oil and gas lease executed by the Land Commissioner under the provision of chapter 4 of title 86, R. S. This lease was assigned by Allsman & Bell in 1928 to A. L. Hawse, and by him to the Grayburg Oil Company on February 1, 1929. The state claimed and was awarded the value of one-eighth of the oil in question, and P. L. Childress et al., assignees of the original permittees, the value of another one-eighth, thus aggregating the one-fourth of all production contracted for by Allsman & Bell, whose contract the Grayburg Company assumed. The Grayburg Pipe Line Company, which transported said oil, is the other appellant, but they make a common appeal, and no issue is made as between them on the judgment rendered.

The oil in question was reduced to possession by digging trenches from one to fourteen feet deep along the west bank of the river through strata of gravel down to the water level of the river. Oil seeped or flowed into these trenches and was then pumped into reservoirs; and such oil as escaped from or overflowed from these trenches into the river was captured by means of "bombs" or surface dams, and was run or pumped from the river into storage.

Immediately west of this area is situated the Yates oil field. There was evidence strongly indicating that because of the tremendous gas pressure in that field, creating a potential production in one well in particular of 175,000 barrels of oil daily at a depth of about 1,200 feet, and because such wells were "pinched in" at the surface, large quantities of oil had been forced out between strings of casing in the wells or through holes in casing, into upper porous strata of the earth through which it migrated, without ever reaching the surface in these wells. A gravel strata extended from the Yates field, where it was several hundred feet below the surface, horizontally to the Pecos river, where it passed underneath the river bed and cropped out along the west bank. It may be assumed, with reasonable certainty, we think, that the oil here in controversy percolated from the Yates field underneath the surface through this gravel strata to the river bank where it was for the first time extracted from the earth through the methods above indicated and first reduced to the possession of any one.

Appellants present two main contentions:

First, that the oil in question was abandoned, waste, or pick-up oil escaping from other leases, was not a part of the mineral estate of the lands leased by the state; and that as such the Grayburg Oil Company and its predecessors were entitled to capture it without payment of any royalty thereon.

Second, that because of the manner in which it appeared and was captured, and because the officers of the state—that is, the land commissioner, the railroad commission, the fish, game and oyster commission, and the comptroller—had, by treating it as waste oil, induced one Halbert and appellants to expend large sums of money to save this oil, the state was therefore estopped to assert any claim to a royalty in such oil.

We do not sustain either of these contentions. While it is well settled in this state that the owner of land likewise owns the oil resting beneath its surface, and may sever and convey same in place, it is equally well settled that the purchaser thereof must bring same into his possession on the surface in order to realize the value thereof. If he permits it to remain beneath the surface and it percolates or escapes through the strata of the earth onto and underneath the land of his neighbor, it thereupon becomes a part of his neighbor's land; and if his neighbor then brings it to the surface, he acquires title thereto, free from any liability to the owner of the land from underneath which it has migrated. Bender v. Brooks, 103 Tex. 329, 127 S. W. 168, Ann. Cas. 1913A, 559; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566; Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S. W. 297, 29 A. L. R. 607; Yates v. State (Tex. Civ. App.) 3 S.W.(2d) 114; United North & South Oil Co. v. Meredith (Tex. Civ. App.) 258 S. W. 556. Consequently, the state owned as a part of the mineral estate in the lands so leased, not only the oil then resting beneath its surface, but such as might thereafter percolate into and beneath that land and be captured while tarrying there. We think it is immaterial from beneath whose lands it migrated, and at what depth beneath the surface it may have moved. When it reached the land owned by the state, that is, the Pecos river bed, traveling through natural formations of the earth and beneath the surface, it became a part of the mineral estate of the land so owned by the state, and included as such within the terms of the lease. That being true, the state was entitled to receive a royalty thereon.

How it may have escaped from the lower formation or oil sand into a higher strata might, of course, present a question of great interest to the state and to the railroad commission in conservation of its natural resources; but that question is not at issue here. So long as this oil had never been brought to the surface nor reduced to the possession of any one, whatever may have been the cause of its migration from one tract of land to another, it still retains its nature as a part of the mineral estate

of the lands from which it may be produced and subject to the provisions of the mineral lease thereon. Extracting said oil from the gravel by digging trenches in or near the bed of the stream, by sinking surface wells, or by excavating pits, constituted mining, drilling, and operating for oil, within contemplation of the terms of said lease. Its proximity to the surface, and the fact that it even seeped from the banks of the stream near the water level, was only the good fortune of the lessee, and in no wise alters the principles involved. The record discloses "operations" in this respect on rather a large scale, digging of such trenches with steam shovels, and the "production" in this manner by appellant oil company between February 10, 1929, and December 31, 1929, of 237,493 barrels of oil, on which it has paid no royalty to any one. This production was in addition to that from wells drilled by appellant oil company in said river bed to the deeper oil producing strata. The oil captured by "bombs" or surface water dams from the waters of the river was shown to have been oil that overflowed the trenches, or that washed therefrom by overflow waters of the river, and would, of course, so far as appellants are concerned, be subject to the same royalty as that taken from the trenches themselves.

Appellants cite and rely largely as sustaining its contention upon what are designated as the "pick-up station" cases, particularly Humphreys Oil Co. v. Liles (Tex. Civ. App.) 262 S. W. 1058; Id. (Tex. Com. App.) 277 S. W. 100; Caldwell-Guadalupe Pick-up Stations v. Gregg (Tex. Civ. App.) 276 S. W. 342; Id. (Tex. Com. App.) 286 S. W. 1083; United North & South Oil Co. v. Mercer (Tex. Civ. App.) 286 S. W. 652.

These cases all relate to waste oil or abandoned oil escaping from one lease onto or across another lease over the surface of the earth after it had already been brought to the surface through wells and reduced to possession. In such cases it has been uniformly held that the first taker who captures such waste or abandoned oil lawfully acquires title thereto. Such taker, of course, is in no sense "producing" such oil as contemplated within the terms of a mineral lease. Before oil can, as considered in those cases, be abandoned, it must of course have been reduced to possession, and then permitted to pass physically into the hands of some one else, or left to waste or disappear through evaporation, saturation, or its own mobility. No such case is here presented, and the rules announced in those cases have no application to the facts of this case.

■ The next contention relates to estoppel or waiver. When the seepage oil, which first appeared through a spring on the west bank of the river, began to accumulate on the surface of the water, it came to the attention of the game, fish and oyster commission that it was polluting the waters of the Pecos river, a navigable stream. That department undertook to burn the oil thus accumulating; but this process soon became a nuisance and a fire hazard to oil development and storage in that area, and notice thereof was also taken by the railroad commission. This was in October, 1928, when one W. E. Halbert was in charge of said lease for A. L. Hawse who then owned the lease. In the negotiations with the game, fish and oyster commission concerning compliance with the anti-pollution laws; and with the railroad commission with reference to preventing waste and fire hazards upon this lease, this oil appears to have been considered by them as waste oil. Accordingly, these two departments, apparently with the assent of the land commissioner, acquiesced in the steps taken by Halbert on his own behalf to capture this oil as waste oil and sell it as his own. This he did at his own expense, and inaugurated the processes of producing this oil later extended and utilized by appellant oil company. The oil so captured by Halbert was sold to the Grayburg Oil Company and moved through the pipe lines of the Grayburg Pipe Line Company. When the matter of payment for such oil arose in December, 1928, the attorney for appellant pipe line company wrote to the railroad commission, asking for confirmation of Halbert's permit to capture the oil, and whether or not the state was claiming any royalty thereon. R. D. Parker, chief supervisor of oil and gas, on December 20, 1928, replied to said letter in which he stated that the oil accumulated by Halbert was considered by the railroad commission as waste oil, and declined to prorate its carriage for that reason; but stated that the commission had no authority whatever to assert any claim for royalty for the state, and referred the pipe line company to the land commissioner under whose supervision that matter belonged. The correspondence with the comptroller was with reference only to the payment of the gross production tax on said oil, and had no reference to the matter of the royalty that might be due the state. It is obvious that each of these departments of the state government was dealing with this oil only with reference to the relation it bore to the matters coming within such department's jurisdiction. That is, in so far as it threatened stream pollution in the one case, conservation and proration in another, and gross receipts tax in the other. None of them had any authority to either waive or collect royalties due the state, nor to determine whether such royalties were so due. Their interpretations as to the character of said oil could have no bearing on the issue here presented. The statutes (articles 5338, 5344, 5344a, 5380, and 5381) prescribe what leases of the state's lands shall contain, the amount

of royalty to be paid, and when, how, and to whom it shall be paid. All these matters are expressly placed under the supervision and control of the land commissioner. The land commissioner, in a letter to Halbert, dated January 12, 1929, in reply to Halbert's letter to him, did state: "From your letter it appears that we were under the wrong impression as to this and that the waste oil which you are picking up on the river bed lease is seepage oil coming from lands west of the river in which it appears the State has no interest in the minerals. If that is true then this department claims no interest for the State in such oil as picked up." A copy of that letter was also sent to the attorney for appellant pipe line company.

It is obvious, however, that the land commissioner was then relying upon information furnished him by Halbert; for on April 29, 1929, the land commissioner wrote the Grayburg Pipe Line Company as follows: "Sometime ago facts were presented to this department concerning oil that was escaping from the banks of the Pecos River adjacent to River Bed Permit No. 11610 and upon the facts then stated this department did not believe that as pick-up oil it would be properly chargeable to the river bed lease. However, recently we have had other information presented to the effect that the oil is coming from the ground within the river bed lease, and assuming such latter information to be correct, this is to advise you that this department will ask that royalty be remitted on all the pick-up oil that comes off of the area properly chargeable to the river bed lease, and further request that you look over the date and make remittance for past production, if such there be from such source."

Since appellant oil company did not acquire the river bed lease until after the letter of January 12, 1929, was written, their operations could not have been then known to the land commissioner. The record also discloses that after the Grayburg Oil Company acquired said lease it undertook to eject Halbert therefrom, evidently on the ground that it was entitled to recover said oil under the terms of said lease, because it is admitted that none of the oil here in controversy escaped from the wells drilled by said company on the lease.

These facts we think constitute no waiver by, nor ground for estoppel against, the state. Even if it be assumed that the conduct of the land commissioner could estop the state, the essential elements of estoppel are lacking. See 17 Tex. Jur. 137. The land commissioner was not guilty of misleading any one. The facts were all known to appellants and their predecessors, but obviously not all known to the land commissioner. And even if he had known all the facts and had advised appellants that the state was not entitled to any royalty, such advice would, under the undisputed facts of this case, be either a mistake of law on the part of the land commissioner or an attempted act in excess of his authority, neither of which would work an estoppel against the state. Carothers v. Rogan, 96 Tex. 113, 70 S. W. 18; Jeems Bayou Fishing & Hunting Club v. U. S., 260 U. S. 561, 43 S. Ct. 205, 67 L. Ed. 403; 10 R. C. L. 705.

The judgment of the trial court is therefore affirmed.

Affirmed.

### On Motion for Rehearing.

Appellants in their motion for rehearing complain in numerous respects of our statement of the facts, as well as of our conclusions of law. Accordingly, we correct our former opinion in the following particulars:

We think the record fairly sustains appellants' contention that instead of the representatives of the railroad commission and the game, fish and oyster commission merely acquiescing in the activities of Halbert and appellant oil company in digging such trenches, that same were dug upon the insistence if not the demand of such representatives of these departments, in order to prevent waste and the pollution of the waters of the Pecos river through the seepage of said oil, unless captured, into the river. There was no showing, however, as to how much of said oil so captured in such trenches would have escaped into the waters of the river, had no trenches been dug. The fact that the methods used by appellant oil company in capturing said oil may have been adopted upon the demand of these agents of the state, however, does not alter our conclusion that these methods constituted "operating for" and "producing and saving" oil from the leased premises within the terms of the lease.

Appellants also complain that there is no evidence to sustain our statement that appellants had paid no royalty on said oil to any one. Perhaps our statement of the matter was too broad. It would perhaps be more accurate to state that appellants have paid no royalties on said oil to the appellees herein, who are, so far as the record shows, the only ones entitled to receive same.

With these corrections, which do not affect the conclusions announced in our opinion nor the judgment entered, said motion is overruled.

Overruled.