THOMPSON ET AL. *v.* CONSOLIDATED GAS UTILITIES CORP. ET AL.

No. 89.   Argued November 18, 19, 1936.—Decided February 1, 1937.

56

57

*Messrs. Wm. Madden Hill,* Assistant Attorney General of Texas, and *C. C. Small,* with whom *Mr. William McCraw,* Attorney General, and *Messrs. William C. Davis* and *W. J. Holt,* Assistant Attorneys General, and *Maurice Cheek* were on the brief, for appellants.

*Mr. S. A. L. Morgan,* with whom *Messrs. C. C. Mount,* *J. J. Hedrick, C. H. Keffer,* and *D. H. Culton* were on the brief, for appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

This case challenges the validity of a gas proration order issued by the Railroad Commission of Texas for the Panhandle fields on December 10, 1935, and carried forward in supplemental orders.[1] The orders were en-

---

[1] The complainants' original bills challenged earlier orders issued by the Railroad Commission under the Act here in question, notably the orders of August 28, and September 25, 1935. These orders were the subjects of temporary injunctions granted in *Texas Panhandle Gas Co.* v. *Thompson,* 12 F. Supp. 462. Upon the issuance of the order of December 10, 1935, complainants amended their bills to make that order and its supplements the object of their attack.

tered under Chapter 120 of the Texas Acts, 1935, Forty-Fourth Legislature, Regular Session, commonly known as House Bill 266. Under the orders the production of sweet gas from the plaintiffs' wells is limited to an amount below their market requirements under existing contracts, below their present production, and below the capacity of their transportation and marketing facilities. It is charged that the purpose of so limiting the production is not to prevent waste, or to prevent invasion of the legal rights of co-owners in the common reservoir, but solely to compel the plaintiffs, and others similarly situated, to purchase gas from those well owners who have not provided themselves with a market and marketing facilities—well owners who under existing law are obliged to stop production, for want of a market, unless some marketing outlet is found.

Two suits to enjoin enforcement of the order were brought in the federal court for western Texas. One was by Texas Panhandle Gas Utilities Company, for which Consolidated Gas Utilities Corporation has been substituted as plaintiff; the other by Texoma Natural Gas Company. In each suit the members of the Railroad Commission and the Attorney General of the State were made defendants. The properties for which the plaintiffs seek protection are their sweet gas wells and reserves in the Texas Panhandle; their pipe lines extending into other States; their compressors and marketing facilities for use in connection therewith; and contracts which they have made for the supply of the gas to distributors in other States. The plaintiffs claim that the order takes this property without warrant in law. They contend that the order is in excess of the authority which House Bill 266 confers upon the Commission; and that if the statute be construed as conferring the authority exercised, it violates the Federal Constitution and that of the State. The District Judge issued a restraining order. The cases

were considered together. The court, three judges sitting, granted temporary injunctions, *Texas Panhandle Gas Co.* v. *Thompson*, 12 F. Supp. 462,[2] and made them permanent, *Consolidated Gas Utilities Corp.* v. *Thompson*, 14 F. Supp. 318. The cases were consolidated for purposes of appeal. The jurisdiction, federal and equitable, was not questioned. The record is extensive; the findings of fact explicit; the briefs in this Court occupy over 500 pages.

The Texas Panhandle contains the largest natural gas field in the United States, an enormous reservoir of natural gas and oil extending through seven counties for a distance of 125 miles with a width of from 10 to 40 miles. The development of the gas industry which began there in 1926 has proceeded at a rapid rate since 1933. The field produces both sweet and sour gas.[3] Wasteful use of sweet gas is prohibited by the statute; and, within the statutory definition, practically the only non-wasteful use is for heat and light. For such use there is substantially no local market,[4] as the region is sparsely settled. Gas cannot be stored. To utilize the sweet gas of the Panhandle field, it must be delivered to the ultimate consumer by pipe lines in a continuous flow from the wells to the burner tips of the consumer. Prior to the entry of the orders challenged, the owners of approximately 80 percent of the total area in the Panhandle fields

[2] Compare note 1, *supra.*

[3] Only sweet gas is fit for lighting and heating. Sour gas is that contaminated by sulphur compounds. It is now used in this field principally in the manufacture of carbon black. When the act was passed, plants supplying 70% of the carbon black manufactured in the United States were operating in this field.

[4] The small market for sweet gas within the field is limited to fuel for the drilling of wells and the operation of industries incident to the oil and gas business; to small pipe lines supplying gas to communities near the field; and to purchases by two companies with pipe lines to distant cities. These have made 30 new connections with wells of others and are taking rateably from these wells.

proven productive of sweet gas had constructed six major pipe lines from the West Panhandle field,[5] and three from the East Panhandle field, extending to Chicago, Des Moines, Omaha, Sioux City, Kansas City, St. Paul, Indianapolis, Denver, Minneapolis, Fort Worth, Dallas, and other distant points. Six or seven of these major pipe line companies, including the plaintiffs', have produced and transported to the markets only gas produced from their own leases.

Under the restrictions imposed by the present statute, there is substantially no market outlet for the sweet gas of these fields except such as may be provided by pipe lines. The owners of 180 wells in the West Panhandle field, and of 121 wells in the East Panhandle field, together representing about 20 per cent of the proven reserves of sweet gas in the whole field, neither own nor control any pipe line. And they have no access to any; [6] since none of the pipe lines here involved is a common carrier. The plaintiffs and most of the other owners of pipe lines have no economic occasion to purchase gas from wells of the non-pipe line producers, as the potential capacity of their own wells far exceeds their market demand.[7] There appears no legal obstacle, under the law of

[5] For administrative purposes the territory is divided into the East Panhandle and the West Panhandle zones. The West zone alone contains any sour gas area. The sweet gas area of the West Panhandle field embraces 723,000 acres. In it there are 517 wells, 180 of which do not have an outlet for light and fuel purposes. The sweet gas area of the East Panhandle field embraces 181,000 acres. In it there are 322 wells, of which 121 do not have an outlet for light and fuel purposes. Gas from the Panhandle field is supplied for domestic and industrial light and fuel purposes to approximately 10,000,000 persons in the United States.

[6] The only exception to this is in the case of the few independent wells with which two of the pipe line companies have made connections. See note 4, supra.

[7] Thus at the time of the hearing below, Texoma Natural Gas Co. was "producing" its wells at the rate of about 10 per cent of their

Texas, to the construction of additional pipe lines to serve the owners of wells in the Panhandle fields now without such connections. It is said that there are communities in other States which would afford markets if pipe lines were constructed to reach them. But the financial difficulties are obvious.

Prior to House Bill 266, several efforts, statutory and administrative, had been made to compel, or induce, the owners of existing pipe lines to purchase the sweet gas of those well owners who lack pipe line facilities. Orders entered under statutes enacted prior to 1933 were enjoined as unconstitutional or *ultra vires*.[8] By chapter

---

daily potential capacity, and the average throughout the year, it was found, had been and would be substantially less than this figure. The highest percentage of the daily potential ever taken over a period of one month for all of the wells of Consolidated Gas Utilities Corporation has been 6.53 per cent. The wells of other pipe line owners in these fields have likewise been "produced" at low percentages of capacity.

[8] (a) Chapter 28, Acts 1931, Forty-Second Legislature, First Called Session, known as The Common Purchaser Act, was construed and applied by the Railroad Commission as requiring private pipe line companies engaged theretofore only in producing and transporting gas from their own leases to purchase without discrimination, under regulations of the Commission, quantities of gas offered them by producers in the field lacking their own pipe lines. The Act was held unconstitutional as in violation of the due process and commerce clauses of the Federal Constitution, and enforcement of the orders was enjoined, in *Texoma Natural Gas Co.* v. *Railroad Commission*, 59 F. (2d) 750.

(b) Purporting to act under the general conservation laws of the State, as amended by Chapter 26, Acts 1931, Forty-Second Legislature, First Called Session, the Railroad Commission subsequently issued orders completely closing down some portions of the Panhandle field, and limiting production from pipe line companies' wells in other portions. Enforcement of these orders was enjoined on the ground that the Commission's action was *ultra vires*, in *Texoma Natural Gas Co.* v. *Terrell*, 2 F. Supp. 168.

(c) By Chapter 2, Acts 1932, Forty-Second Legislature, Fourth Called Session, the Railroad Commission was meantime authorized,

100, Acts 1933, Forty-Third Legislature, Regular Session,[9] the use of natural gas was permitted for other purposes than light or fuel, including the manufacture of natural gasoline, where no reasonable market for light or fuel was available to the owner. Production under authority of this statute and the permits issued thereunder was found to involve intolerable waste.[10] Such was the situation, when on May 1, 1935, the Legislature enacted House Bill 266, under which the order here challenged was issued.

The Act undertakes by drastic provisions to end the waste of sweet gas. It provides:

"Sec. 3. The production, transportation, or use of natural gas in such manner, in such amount, or under such conditions as to constitute waste is hereby declared to be unlawful and is prohibited. The term 'waste' among

whenever the full production from wells producing gas from a common reservoir should exceed reasonable market demand, to limit production to such demand and allocate the allowable production. Orders purporting to be issued under the authority of this Act were enjoined in *Canadian River Gas Co.* v. *Terrell,* 4 F. Supp. 222, on the ground that they were *ultra vires* because the statute authorized regulation only to prevent waste, and the court concluded that the orders did not bear any reasonable relation to that end.

(d) Then followed the enactment of the statute now under consideration.

[9] As amended by Chapter 88, Acts 1933, Forty-Third Legislature, First Called Session. Compare *F. C. Henderson, Inc.* v. *Railroad Commission,* 56 F. (2d) 218; *Sneed* v. *Phillips Petroleum Co.,* 76 F. (2d) 785.

[10] According to evidence presented by the State, in July, 1935, before the prohibitions of House Bill 266 became effective against uses therein declared wasteful, there were in the West Panhandle field 41 stripping plants producing natural gasoline, consuming daily 1,847,339 M. C. F. sweet gas, from which the gasoline production saved only 3 per cent of the fuel value of the gas in its original state. Between February 1, 1933, and August 1, 1935, 709 billion cubic feet of gas were said to have been blown into the air after the natural gasoline content had been extracted.

other things shall specifically include: [then follow specifications (a) to (m) inclusive].

"(h) The production of natural gas in excess of transportation or market facilities, or reasonable market demand for the type of gas produced."

The defendants contend that the Act likewise requires restriction of production regardless of the existence of waste, for the adjustment of rights of owners in a common reservoir of gas. And as we read the substance of defendants' argument, they also construe the statute as authorizing gas proration orders, to provide a market for the sweet gas of those wells which, because they lack pipe line connections, have heretofore sold their gas for inferior, wasteful uses. These claims are rested primarily on the following provision:

"Sec. 10. It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir in the manner and method herein set forth. The Commission shall prorate and regulate such production for the protection of public and private interests: (a) In the prevention of waste as 'waste' is defined herein; (b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article."

This provision is supplemented by others including those set forth in the margin.[11]

---

[11] "SECTION 1. Declaration of policy: In recognition of past, present, and imminent evils occurring in the production and use of natual [natural] gas, as a result of waste in the production and use thereof in the absence of correlative opportunities of owners of gas in a common reservoir to produce and use the same, this law is enacted for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production."

"SEC. 11. The Commission shall exercise the authority to accomplish the purpose designated under item (a) of Section 10 when the presence or imminence of waste is supported by a finding based

On December 10, 1935, the Railroad Commission, after hearings held, issued the basic order here challenged, which provides, among other things:

"It is ordered, That effective, 7 o'clock A. M., December 11, 1935, the daily allowable gas production, computed on the basis set forth in House Bill No. 266, is as follows:

East Panhandle Field.................. 181,174,000 cubic feet daily
West Sweet Panhandle Field............. 608,552,000 cubic feet daily
West Sour Panhandle Field.............. 451,137,000 cubic feet daily

"It is ordered, That the daily allowable production of gas for individual wells in the East and West Panhandle Fields shall be determined by dividing the reasonable market demand into two parts, and that these parts shall be distributed to each well in proportion to the relative

upon the evidence introduced at a hearing to be held as herein provided.

"The Commission shall exercise the authority to accomplish the purpose designated under item (b) of Section 10 when evidence introduced at a hearing to be held as herein provided will support a finding made by the Commission that the aggregate lawful volume of the open flow or daily potential capacity to produce of all gas wells located in a common reservoir, is in excess of the daily reasonable market demand for gas from gas wells that may be produced from such common reservoir, to be utilized as permitted in this Article.

"Sec. 12. On or before the twentieth (20th) day of each calendar month the Commission shall hold a hearing . . . for the purpose of determining the aggregate daily capacity to produce of all gas wells in a common reservoir, and as nearly as possible, the daily volume of gas from each common reservoir that will be produced from gas wells during the following month to be utilized as permitted in this Article. Upon such determination, the Commission, based upon evidence introduced at such hearing, shall allocate to each gas well producing gas from such common reservoir a percentage of the daily productive capacity of each well which may be produced daily during the following month from each gas well producing gas from such common reservoir. Such percentage of the daily producing capacity

producing ability of these individual wells and the number of acres containing each of these wells, but in no case shall more than one hundred sixty (160) acres in the East Panhandle Field and not more than Six Hundred Forty (640) acres in the West Panhandle Field, in both sweet and sour zones, be allocated to any one well for the purpose of proration.

"It is ordered, That the total daily allowable production of gas from gas wells in the East and West Pan-

---

of each well shall be regarded as its daily allowable production of such daily volume required for utilization from such common reservoir. . . .

"Sec. 14. It shall be the duty of the Commission, after notice and hearing, to ascertain and determine the reasonable market demand for gas from gas wells to be used for light and fuel purposes and for all other lawful purposes to which sweet gas may be put under the terms of this Article and by proper order to restrict the production of gas from all gas wells in said field producing such gas to an amount equal to market demand or to an amount which may be produced without waste as otherwise defined; provided, however, the production of such gas shall in any event be restricted to the amount of the reasonable market demand therefor. In such order the Commission shall allocate, distribute or apportion the total allowable production from such field among the various gas wells affected by the order on a reasonable basis, and as provided in Section 13. . . .

"Sec. 16. It shall be unlawful for any person to produce gas from a gas well as herein defined in excess of the daily allowable production in such schedule of allowable production. . . .

"Sec. 20. In the event the Commission finds that the owner of any gas well has failed or refused to utilize or sell the allowable production from his well when such owner has been offered a connection or market for such gas at a reasonable price, such well shall be excluded from consideration in allocating the daily allowable production from the reservoir or zone in which same is located until the owner thereof signifies to the Commission his desire to utilize or sell such gas. In all other cases all gas wells shall be taken into account in allocating the allowable production among wells producing the same type of gas."

handle Fields shall be distributed and prorated among the individual wells on the following basis and in the following manner, to-wit: Fifty (50%) per cent of the reasonable market demand of the field shall be allocated on the ratio of the individual well acreage to the sum of the total well acreage in the field; and fifty (50%) per cent of the reasonable market demand of the field shall be allocated on the ratio of the individual well potential to the sum of the total well potentials in the field."

The order reduces plaintiffs' allowable production to a volume far below their requirements. The plaintiffs and other pipe line owners acquired, at large cost, their markets in distant States and their transportation and marketing facilities.[12] By means of their pipe lines all the sweet gas produced by the plaintiffs (and likewise all produced by other pipe line owners) was, and is, marketed under contracts with distant distributors, chiefly in other States. These markets are not free markets. The plaintiffs necessarily bound themselves to supply the requirements of the distributors; and the distributors bound themselves to take their requirements from the plaintiffs. In order to fulfill their contractual obligations, the plaintiffs developed the capacity of their wells and acquired large reserves to provide for their future needs so that they have no occasion to purchase gas from other wells. By limiting the plaintiffs' allowable production, the order disables them from perform-

---

[12] The Texoma Natural Gas Company (with an affiliate) has, at a cost of about $72,000,000, acquired 200,000 acres of leases in the West Panhandle field known to be capable of producing sweet gas; drilled about 90 wells; erected a compressor plant; constructed a pipe line to its Chicago market; and secured marketing contracts for distribution in other States. Similarly, the Consolidated Gas Utilities Company (with affiliates) has expended a smaller sum in acquiring and developing gas reserves in the East Panhandle field and in constructing pipe lines to, and securing contracts for marketing its gas in Kansas.

ing their contracts unless they purchase gas from non-pipe-line wells. Such purchases would at least involve the cost of the gas and the loss resulting from failure to make fuller use of their own property.

The plaintiffs do not contest that the State has power to conserve its natural resources for the public, as well as to protect private rights,[13] or that the Legislature has power to confer upon the Railroad Commission authority to make and enforce regulations to that end; or that to limit production to the aggregate reasonable market demand is, as a conservation measure, clearly proper in the interest of the public and of the private persons owning the right to draw from a common reservoir; or that the Commission has authority to issue regulations to that end. The plaintiffs do not deny that the Legislature may confer upon the Railroad Commission also authority to prorate the total allowable production among all the individual wells which draw from the common reservoir, provided the proration is in accordance with their respective market demands and due consideration is given to existing reserves. But they insist that House Bill 266 has not conferred that authority. And as to the order, the plaintiffs assert that, while restrictive in form, it is in fact coercive; that its purpose and effect are not to prevent waste of gas in the common reservoir nor to prorate the opportunities of production as distinguished from marketing; that the limitation of the production of the wells is merely a device to compel the individual plaintiffs, and other pipe line owners, to purchase gas for which they have no need; that the real purpose and

[13] Section 59 of Article 16 of the Constitution of Texas, which article was proclaimed October 2, 1917, provides, in part:

"The conservation and development of all the natural resources of this State . . . and the preservation and conservation of such natural resources of this State are each and all hereby declared public rights and duties, and the Legislature shall pass all such laws as are appropriate thereto. . . ."

**68**

effect of the order are to prorate not production, but distant markets and the facilities for serving them; and that, thus, the order takes their property without warrant in law.

*First.* Prior to the enactment of House Bill 266,[14] the property rights of the plaintiffs were substantially those conferred by the common law of the State. Under it, the owner of land has title to oil and gas in place and, likewise, to the oil and gas which migrate to formations under his land through drainage from other lands.[15] Under that rule, he may produce all the oil and gas that will flow out of the well on his land, subject to the exercise by other landowners of the same right of capture through drilling offsetting wells, so as to get their full share.[16] This common law rule, declared in an unbroken line of authorities, has been widely applied.[17] While a producer who negligently uses explosives in his operations will be liable if he causes physical damage to his

[14] House Bill 266 amends Article 6008 of the Revised Civil Statutes, which is the statute particularly dealing with the production and use of natural gas. That article was amended by Chap. 26 of Acts of 1931, Forty-Second Legislature, First Called Session, p. 46. It was again amended by Chap. 100 of the Acts of 1933, called the "Sour Gas Law," Forty-Third Legislature, Regular Session, p. 222; also by Chap. 88 of the Acts of 1933, Forty-Third Legislature, First Called Session, p. 229, which remained in force until August 1, 1935, when House Bill 266 became effective.

[15] See *Texas Co.* v. *Daugherty,* 107 Tex. 226, 176 S. W. 717; *Stephens County* v. *Mid-Kansas Oil & Gas Co.,* 113 Tex. 160, 254 S. W. 290; *Grayburg Oil Co.* v. *State,* 50 S. W. (2d) 355.

[16] *Prairie Oil & Gas Co.* v. *State,* 231 S. W. 1088 (Tex. Comm. App.); compare *Houston & Texas Central R. Co.* v. *East,* 98 Tex. 146, 81 S. W. 279.

[17] Compare, e. g., *Hermann* v. *Thomas,* 143 S. W. 195 (Tex. Civ. App.); *United North & South Oil Co.* v. *Meredith,* 258 S. W. 550 (Tex. Civ. App.), affirmed, 272 S. W. 124 (Tex. Comm. App.); *Hunt* v. *State,* 48 S. W. (2d) 466 (Tex. Civ. App.); *Malone* v. *Barnett,* 87 S. W. (2d) 523 (Tex. Civ. App.). See *Brown* v. *Humble Oil & Refining Co.,* 83 S. W. (2d) 935 (Tex. Sup. Ct.).

neighbors' gas and oil bearing strata and thus impairs the productivity thereof,[18] the common law of the State did not, apparently, afford a remedy against depleting the common supply by wasteful taking or use of oil or gas drawn from the wells on one's own property. But since 1899 the Legislature of the State has prohibited, or curbed, certain practices in the production of gas and oil which it recognized as wasteful.[19]

*Second.* The defendants contend that the order assailed is a regulation duly promulgated for the prevention of waste, and the protection of correlative rights of owners in the common pool, and was so applied. It may be assumed that House Bill 266 should be construed as authorizing regulations to prevent waste, and to create and protect correlative rights of owners in a common reservoir of gas to their justly proportionate shares thereof, free of drainage to neighboring lands. It may be assumed, also, that the statute, so construed, is a valid exercise of the State's undoubted power to legislate to those ends; and that it validly delegates to the Railroad Commission authority to promulgate regulations therefor. It is settled that to all administrative regulations purporting to be made under authority legally delegated, there attaches a presumption of the existence of facts justifying the specific exercise. *Pacific States Box & Basket Co.* v. *White,* 296 U. S. 176, 185. But, obviously, the proration orders would not be valid if shown to bear no reasonable relation either to the prevention of waste or the protection of correlative rights, or if shown to be

---

[18] See *Comanche Duke Oil Co.* v. *Texas Pacific Coal & Oil Co.,* 298 S. W. 554 (Tex. Comm. App.).

[19] See *Danciger Oil & Refining Co.* v. *Railroad Commission,* 49 S. W. (2d) 837, 840 (Tex. Civ. App.), reversed and dismissed as moot, 122 Tex. 243; 56 S. W. (2d) 1075 (Tex. Comm. App.); *Brown* v. *Humble Oil & Refining Co.,* 83 S. W. (2d) 935, 940, 941 (Tex. Sup. Ct.).

otherwise arbitrary. The plaintiffs have assumed the heavy burden of overcoming the presumption and of establishing that the order is an arbitrary taking of their property. They assert, among other things, that they have, at all times, conducted their operations prudently and without waste; that they have, in fact, taken only a small part of the gas in the ground which they own or lease; and that there is no present danger that the pipe line owners will, by continuing to operate as they have done, cause waste or prejudice either to any public interest, or to a property right of any other person. We think the plaintiffs have sustained the burden resting upon them. For their assertions are adequately supported by the following special findings of the lower court:

1. "The owners of wells connected to pipe lines, including complainants, have always produced their wells in a prudent and skilful manner and in accordance with the most approved methods of production, without committing or causing physical waste."

2. "Before House Bill 266 went into effect, grossly wasteful practices in the production of natural gas in the Panhandle field were occurring," but "most of this waste was due to the extravagant production of natural gas from oil wells and to the production of gas from gas wells and processing such gas for the extraction of a very small quantity of natural gasoline therefrom and popping or wasting to the air the residue gas, which constituted 97% of the fuel value of the gas in its original state. . . . No evidence was offered—indeed, it was not even seriously claimed—that anything complainant had done or contemplated doing has, in the slightest degree, contributed or will contribute to that waste."

3. Even if the effect of the Texas legislation be to halt production by other well owners, "the production from their own wells by complainant and other pipe lines of the quantity of gas required from time to time to fulfill

their marketing contracts and requirements will cause no coning or channeling of water, no trapping off of recoverable oil or gas, no underground waste of oil, gas or reservoir energy or reduction of the total quantity of recoverable gas from the field, even though the other wells in the sweet gas area of the West Panhandle field be produced at a much lower rate or be not produced."

4. Large and wasteful production of gas in connection with production of oil in the Panhandle field, and, more recently, in connection with the operations of plants "stripping" the gas of its natural gasoline content, "has resulted in the migration of tremendous quantities of natural gas from the southwestern side of the field to the northeastern side of the field. Many of these areas of low pressure are situated in the sour gas producing area, with the result that tremendous quantities of sweet gas have moved out from the sweet gas area into the sour gas area," and have thus become unfit for use as fuel for lighting and heating purposes. Drainage away from the areas of complainants' holdings is found to have been intensified by disproportionate production of gas from gas wells not connected to pipe lines. In the East Panhandle field "the leases on which the wells connected to pipe lines are located have produced an average—[of] 8,116,-000 cubic feet of gas per acre, and those on which the wells connected to stripping plants are located have produced an average of 16,662,000 cubic feet per acre." In the West Panhandle field, production at the time of trial of this case had aggregated 4,427,642,131,000 cubic feet. "Of this total the pipe lines, with an ownership of 56% of the total reserves, have produced only 529,545,454,000 cubic feet, while the owners of the other 44% have produced 3,898,096,776,000 cubic feet. Complainant, with an ownership of approximately 20% of the total reserves, had produced only 98,808,409,000 cubic feet, or 2.25% of the total withdrawals from the West Panhandle field."

The average rock pressure of the wells not connected to pipe lines is materially lower than that of complainants' and other pipe line companies' wells. Hence, in the West Panhandle field, "by reason of these differentials in pressure between the wells connected to pipe lines and those not connected, the migration or drainage as a whole is from the wells connected to pipe lines, including those connected to complainant's pipe lines, to the wells not connected to pipe lines." Likewise, "all along the northeast slope of the structure in the East Panhandle field there is an extremely low pressure area, where tremendous quantities of gas have been produced in connection with the operation of oil wells and wells connected to stripping plants. The general drainage in the East Panhandle field is from the areas of high pressure toward and to these low pressure areas. The majority of the wells not connected to pipe lines are situated in these low pressure areas, or between these low pressure areas and the high pressure areas to the south and west thereof, in which areas of higher pressure the wells connected to the pipe lines are situated. . . . Very large quantities of gas have migrated from the reserves of the pipe lines, including the reserves of complainants, to the low pressure areas in and around the oil fields on the northeast slope of the reservoir and to the areas on which most of the 391 wells belonging to others than the pipe lines in the West Panhandle field are situated." Further, past losses do not complete the story. "Without regard to the rate of withdrawal in the existing areas of low pressure, the migration of gas from the reserves of the pipe lines to those areas of low pressure will continue over a long period of time."

In the light of these findings the lower court concluded that the order was not intended to prevent waste attributable to plaintiffs; and that it was not intended to adjust correlative rights in the common reservoir for the

purpose of averting unjust drainage from the reserves of those wells lacking pipe line connections. On the other hand, the court concluded that the proration ordered, with its drastic limitation of output from wells now connected to pipe lines, will obviously not protect those wells against undue drainage to other parts of the field, but will deprive their owners of the protection which fuller production would offer. These findings are adequately supported by the evidence.

On the other hand, the assertion of the defendants that the order will, by requiring a uniform and rateable system of production by all the wells, result in the ultimate recovery of a larger amount of gas than would otherwise be produced; and, likewise, the assertion that the plaintiffs, by their present production, are depriving, or threaten to deprive, non-pipe-line owners of their opportunity to share rateably in the gas in the common reservoir, are not sustained. By the assignment of errors in this Court, defendants challenged the correctness of many of the findings. But we are of opinion that, so far as here material, all their contentions, and also the findings of the Railroad Commission in its order of December 10, prophesying "waste" if the proration ordered is not carried out, are unfounded.

*Third.* The defendants contend, apparently, that House Bill 266 should be construed as authorizing the Commission to reduce the production of the plaintiffs and of other pipe line owners, even if the sole purpose of doing so is to furnish a market for the sweet gas of those wells now without pipe line connections. On the other hand, the plaintiffs insist that House Bill 266 should be construed as authorizing the proration of production only in connection with, and as part of, waste prevention; and that since their operations do not involve, or threaten waste, the order was without statutory authority. That contention the lower court sustained. It did so, on the

ground that to authorize the restriction of non-wasteful production by the pipe line well owners solely for the purpose of compelling them to furnish other wells with a market, would be a change of the common law of Texas so radical that, if the Legislature had so intended, it would have expressed that intention in language more explicit than any used in the Act. Moreover, the court pointed out that, under the established rule of construction, the interpretation urged by defendants should be avoided because the statute so construed would be of doubtful validity.[20]

We are always reluctant to pass upon a seriously controverted question of the meaning of a state statute, because our decision, although disposing of the particular case, cannot settle the issue of the proper construction of the statute.[21] No court of the State has construed the Act. The defendants might, perhaps, have secured its construction by the state court. For the amendment of § 266 of the Judicial Code made in 1913, provides that upon the institution of an appropriate suit in a state court, a stay may be had of the proceedings in the federal court to await adjudication by the state court.[22] But no suit in a state court was instituted by the defendants to that end. When not instructed by some decision of a state court, we are disposed, in exercising appellate jurisdiction, to accept the construction given by the lower federal court to a statute of the State, particularly when that court is composed, as in this in-

[20] *Harriman* v. *Interstate Commerce Comm'n,* 211 U. S. 407, 422; *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408.

[21] Compare *Pullman Co.* v. *Knott,* 235 U. S. 23, 27; *Lee* v. *Bickell,* 292 U. S. 415, 425; *Fox* v. *Standard Oil Co. of New Jersey,* 294 U. S. 87, 97.

[22] Act of March 4, 1913, c. 160, 37 Stat., p. 1013. Compare Welch Pogue, "State Determination of State Law and the Judicial Code," 41 Harv. L. Rev. 623, 626, *et seq.*

stance, wholly of citizens of the State, familiar with the history of the statute, the local conditions to which it applies, and the character of the State's laws.[23]   But, being under duty to make an independent study of the question, we have done so.[24]   That study leaves us in grave doubt whether the lower court has correctly interpreted the intention of the lawmakers.[25]   On the other hand, we are clearly of opinion that if the Act were construed as the defendants contend it should be, and as the Commission has applied it, it would violate the Federal Constitution.   As a general rule it is no less true with reference to State than to Federal legislation that this Court will not decide an issue of constitutionality if the case may justly and reasonably be decided upon a

[23] Compare *Wilson Cypress Co.* v. *Del Pozo y Marcos,* 236 U. S. 635, 657; *Hammond* v. *Schappi Bus Line, Inc.,* 275 U. S. 164, 169. See *Bowman* v. *Continental Oil Co.,* 256 U. S. 642, 647; *Louisiana Public Service Comm'n* v. *Morgan's Louisiana & Texas Railroad & Steamship Co.,* 264 U. S. 393, 397; *Wabash Valley Electric Co.* v. *Young,* 287 U. S. 488, 497; *Marion* v. *Sneeden,* 291 U. S. 262, 271. This Court has consistently accorded great deference to the construction of territorial legislation adopted by the local courts, whether the prevailing system was the common or the civil law, and this though in such cases this Court possesses authority to make a definitive construction which it lacks in the case of the legislation of a State. See *Fox* v. *Haarstick,* 156 U. S. 674, 679; *Kealoha* v. *Castle,* 210 U. S. 149, 153; *Phoenix Ry. Co.* v. *Landis,* 231 U. S. 578, 579; *Diaz* v. *Gonzalez,* 261 U. S. 102, 105, 106; · compare *Reynolds* v. *Fewell,* 236 U. S. 58, 67.

[24] See *St. Louis-San Francisco Ry. Co.* v. *Middlekamp,* 256 U. S. 226, 230; *Bratton* v. *Chandler,* 260 U. S. 110, 114; *South Utah Mines & Smelters* v. *Beaver County,* 262 U. S. 325, 331; *Corporation Commission* v. *Lowe,* 281 U. S. 431, 438; *Fox* v. *Standard Oil Co. of New Jersey,* 294 U. S. 87, 95, 96.   Compare *Philippine Sugar Estates Development Co.* v. *Philippine Islands,* 247 U. S. 385, 390; *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500, 522, 523.

[25] Compare *Van Dyke* v. *Geary,* 244 U. S. 39, 46; *Palmetto Fire Insurance Co.* v. *Conn,* 272 U. S. 295, 305; *Lee* v. *Bickell,* 292 U. S. 415, 424; *Fox* v. *Standard Oil Co. of New Jersey,* 294 U. S. 87, 96.

construction of the statute under which the act is clearly constitutional. Compare *Bratton* v. *Chandler*, 260 U. S. 110, 114; *South Utah Mines & Smelters* v. *Beaver County*, 262 U. S. 325, 331; *Hopkins* v. *Southern California Telephone Co.*, 275 U. S. 393, 403. But where one party's case depends upon a construction of a state statute under which it plainly must be held to violate the Federal Constitution, and where the proper construction of the statute is a matter of grave doubt, this Court will rest its decision on the Constitution, and will not undertake to decide the question of construction as to which it lacks the power to give a definitive answer. Compare *Pacific Telephone & Telegraph Co.* v. *Kuykendall*, 265 U. S. 196, 204; *Michigan Public Utilities Comm'n* v. *Duke*, 266 U. S. 570, 578; *Sterling* v. *Constantin*, 287 U. S. 378, 396. We, therefore, accept, for the purposes of our decision, the defendants' construction; and pass to the discussion of constitutional questions.

*Fourth.* Either production greater than the demand or use for an inferior purpose would necessarily involve overground waste of gas. The manner, place, or extent of production might lead to underground waste. We assume that the prohibition of any wasteful conduct, whether primarily in behalf of other owners of gas in the common reservoir, or because of the public interests involved, is consistent with the Constitution of Texas and that of the United States, and that to prevent waste production may be prorated.[26] We assume, also, that the State may constitutionally prorate production in order to

---

[26] *Ohio Oil Co.* v. *Indiana (No. 1)*, 177 U. S. 190; *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61; *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229; *Walls* v. *Midland Carbon Co.*, 254 U. S. 300; *Bandini Petroleum Co.* v. *Superior Court*, 284 U. S. 8; *Champlin Refining Co.* v. *Corporation Commission*, 286 U. S. 210; *Sterling* v. *Constantin*, 287 U. S. 378.

prevent undue drainage of gas from the reserves of well owners lacking pipe line connections.[27]   If proration were lawfully applied for any such purposes, the fact that thereby other private persons would incidentally and gratuitously obtain important benefits would present no constitutional obstacle.   And the fact that plaintiffs' gas is to be sold in interstate commerce would not preclude such exercise of the State's power.   Compare *Champlin Refining Co.* v. *Corporation Commission,* 286 U. S. 210, 235.

But the sole purpose of the limitation which the order imposes upon the plaintiffs' production is to compel those who may legally produce, because they have market outlets for permitted uses, to purchase gas from potential producers whom the statute prohibits from producing because they lack such a market for their possible product.   Plaintiffs' operations are neither causing nor threatening any overground or underground waste. Every well owner in the field is free to produce the gas, provided he does not do so wastefully.   He is legally and, so far as appears, physically free to provide himself with a market and with transportation and marketing facilities.   There is no basis for a claim that his right, or opportunity, will be interfered with by a disproportionate taking by any one of those who may legally produce.

The lower court found specifically:

"The terms and provisions of the orders attacked, the necessary operation and effect of such orders, the history of the field and other pertinent facts as disclosed by this record conclusively establish that the purpose of the Commission underlying the orders was, upon a theory of protecting correlative rights to coerce complainant and other [others] similarly situated to buy gas from, and thus to share their private marketing contracts and commitments and the use of their pipe lines and other facil-

---

[27] Compare cases cited in note 26, *supra.*

ities for transmitting their gas to market with, the owners of wells not now connected to pipe lines, who have not contributed in money, services, negotiations, skill, forethought or otherwise to the development of such markets and the construction of such pipe lines and other facilities. In short to compel complainants to afford markets to those having none.

"The necessary operation and effect of such orders is to take from complainant and others similarly situated substantial and valuable interests in their private marketing contracts and commitments and in the use of their pipe lines and other facilities for transmitting their gas to their markets, without compensation, and to confer same upon the owners of the approximately 180 sweet gas wells in the field not connected to pipe lines."

The use of the pipe line owner's wells and reserves is curtailed solely for the benefit of other private well owners. The pipe line owner, a private person, is, in effect, ordered to pay money to another private well owner for the purchase of gas which there is no wish to buy.[28] Moreover, he is thus prevented from protecting himself, to the extent that he is able to market his gas, against the losses which the court below finds are occurring and will continue to occur due to drainage from the high pressure areas, wherein plaintiffs' wells are located, to the existing low pressure areas, in which are located the majority of the wells not connected to pipe lines. There is here no taking for the public benefit; nor is payment of compensation provided. Plaintiffs' pipe lines are private property. So far as appears, they are constructed on private lands. There is no suggestion that

---

[28] Plaintiffs claim that they will be obliged to incur further expense in the construction of gathering lines to connect their pipe lines with the wells of others. There is no finding of willingness on the part of non-pipe line well owners to assume or share such expense.

any of them is a common carrier of gas. The purpose of the owners in constructing the pipe lines was for the transport of gas only from their own leases, and such has been their consistent policy. Unlike the property involved in *The Assigned Car Cases*, 274 U. S. 564, the pipe lines are not used in connection with the operation of any public utility in Texas.[29]

The purpose of this order is the same as that which the Legislature sought to achieve by the "Common Purchaser Act," of August 12, 1931, held unconstitutional in *Texoma Natural Gas Co.* v. *Railroad Commission*, 59 F. (2d) 750. The effect upon the property of the pipe line owners of the two statutes and the orders issued thereunder is, likewise, the same. There is a difference in the means employed; but the difference is not of legal significance. The 1931 Act attempted to compel the purchase by frankly commanding it, under sanctions criminal and civil. The 1935 Act operates by indirection. Its command is no less compelling; its penalties not significantly different. The order disables the plaintiffs from performing their contracts except by means of purchases. Resort to those means necessarily results in depriving the plaintiffs of property. Under each statute, if obeyed, the State takes from the pipe line owner the money with which the purchase is made, the money lost through curtailed use of properties developed at large expense, the money lost because of the drainage away from his land of the gas which he is forbidden to produce for himself, but must buy from those towards whose lands it migrates.

Our law reports present no more glaring instance of the taking of one man's property and giving it to another.

---

[29] Compare *Producers Transportation Co.* v. *Railroad Commission*, 251 U. S. 228, 230, 231; *Michigan Public Utilities Comm'n* v. *Duke*, 266 U. S. 570, 577, 578; *Smith* v. *Cahoon*, 283 U. S. 553, 563.

In *Missouri Pacific Ry Co.* v. *Nebraska,* 164 U. S. 403;
*Missouri Pacific Ry. Co.* v. *Nebraska,* 217 U. S. 196;[30]
*Great Northern Ry. Co.* v. *Minnesota,* 238 U. S. 340;
*Great Northern Ry. Co.* v. *Cahill,* 253 U. S. 71; *Delaware,
L. & W. R. Co.* v. *Morristown,* 276 U. S. 182; and *Chicago,
St. P., M. & O. Ry. Co.* v. *Holmberg,* 282 U. S. 162,
expenditures directed to be made for the benefit of a
private person were held invalid, although the party
ordered to pay was a common carrier. In *Loan Associa-
tion* v. *Topeka,* 20 Wall. 655, and *Cole* v. *La Grange,* 113
U. S. 1, the payments ordered for the benefit of a private
person were declared invalid, although the money was to
be raised by general taxation. In *Myles Salt Co.* v.
*Board of Commissioners,* 239 U. S. 478, the exaction was
held unlawful, though imposed under the guise of an
assessment for alleged betterments. Compare *Georgia
Railway & Electric Co.* v. *Decatur,* 295 U. S. 165. And
this Court has many times warned that one person's
property may not be taken for the benefit of another
private person without a justifying public purpose, even
though compensation be paid. See *Hairston* v. *Danville
& Western Ry. Co.,* 208 U. S. 598, 605, 606; *Rindge Co.*
v. *County of Los Angeles,* 262 U. S. 700, 705. Compare
*Cincinnati* v. *Vester,* 281 U. S. 439, 446, 449.

*Fifth.* The defendants contend that the situation in
the Panhandle field presented a conflict of private inter-
ests so serious as to become a matter of public concern;
and that the Legislature has power to adopt measures to
prevent the harmful discord. They insist, moreover, that
the plaintiffs, having invoked the legislative action to
stop the wasteful and disproportionate drawing of sweet
gas by others—a prohibition of which they are now reap-
ing the benefits—may not deny the legislative power to

[30] See *Chicago & Northwestern Ry. Co.* v. *Ochs,* 249 U. S. 416,
421, 422.

authorize the incidental limitations of its own production; since the Legislature would not have prohibited the waste, or inferior uses of the gas, without providing for its purchase by the pipe line companies. Whether the latter assertion is true in fact, we do not know. But it is clear that there is no basis in law for the argument, since there is no claim that plaintiffs ever consented to inserting any such provision in the Act. Indeed, they insist, as a matter of construction, that the Legislature has not done so. And, House Bill 266 is so much more drastic a statute than the restrictions upon inferior uses of gas which were apparently the object of plaintiffs' efforts before the Legislature, that in their present situation plaintiffs cannot fairly be said to be receiving the benefits and evading the burdens of a measure which they initiated. Moreover, plaintiffs do not assert rights under the statute which they assail. They have not taken, and are not obliged to take, any affirmative steps thereunder to obtain whatever benefits may accrue to them because of the restrictions imposed on production for inferior uses. Compare *Daniels* v. *Tearney,* 102 U. S. 415, 421; *Wall* v. *Parrot Silver & Copper Co.,* 244 U. S. 407, 411; *Booth Fisheries Co.* v. *Industrial Commission,* 271 U. S. 208, 211. Those benefits result incidentally from the enactment of other provisions of the Act, the constitutionality of which is not questioned, and which seem clearly separable from the sections here challenged. Compare *Hurley* v. *Commission of Fisheries,* 257 U. S. 223; *United Fuel Gas Co.* v. *Railroad Commission,* 278 U. S. 300, 308.[31]

*Affirmed.*

---

[31] Cases are collected in Notes, 34 Col. L. Rev. 1495; 48 Harv. L. Rev. 988.