## UNITED STATES v. PERKO et al.
## UNITED STATES v. ZUPANCICH.

Civ. A. Nos. 1233, 1269.

United States District Court
D. Minnesota, Fifth Division.

Sept. 26, 1952.

Philip Neville, U. S. Atty., St. Paul, Minn., C. U. Landrum, Sp. Asst. to Atty. Gen., William W. Essling, Asst. U. S. Atty., St. Paul, Minn., and Thomas L. McKevitt, Attorney, Department of Justice, Washington, D. C., for United States.

Edward L. Boyle, Duluth, Minn. (Fryberger, Fulton & Boyle, Duluth, Minn., of counsel), for defendants.

NORDBYE, Chief Judge.

The pertinent portions of Executive Order No. 10092 read as follows,

"By virtue of the authority vested in me by section 4 of the Air Commerce Act of 1926 (44 Stat. 570; 49 U.S.C.

174 [49 U.S.C.A. § 174]), and as President of the United States, it is ordered as follows:

"1. The airspace below the altitude of 4,000 feet above sea level over the following-described areas in the counties of Cook, Lake, and St. Louis, State of Minnesota, is hereby reserved and set apart as an airspace reservation:

"Those areas of land and water within the exterior boundaries of the Superior National Forest which have heretofore been designated by the Secretary of Agriculture as the Superior Roadless Area, the Little Indian Sioux Roadless Area, and the Caribou Roadless Area, respectively, and which are more particularly described as follows: * * *.

"2. After January 1, 1951, no person shall navigate an aircraft within this airspace reservation except in conformity with the provisions of this order and as permitted by or under the authority of regulations prescribed by the Secretary of Agriculture.

"3. Aircraft may be navigated within this airspace reservation when necessary for any of the following-described purposes:

"(a) Making an emergency landing.

"(b) Navigating when low-level flight is necessary for safety.

"(c) Conducting or assisting in the conduct of official business of the United States, the State of Minnesota, or of Cook, St. Louis, or Lake County, Minnesota.

"(d) Conducting rescue operations.

"4. Subject to general regulations of the Secretary of Agriculture, aircraft may be navigated within this airspace reservation until January 1, 1952, for the purpose of direct travel to and from underlying private lands; provided that air travel was a customary means of ingress to and egress from such lands prior to the date of this order.

"5. The Secretary of Agriculture shall carry out the provisions of this order, and for such purpose he is authorized to prescribe appropriate regulations.

"6. Any person navigating an aircraft within this airspace reservation in violation of the provisions of this order will be subject to the penalties prescribed by the Civil Aeronautics Act of 1938 (52 Stat. 973), as amended [49 U.S.C.A. § 401 et seq.]."

Defendants Perko, Skala and Zupancich operate resorts on certain border lakes between the United States and Canada and in the area covered by the air ban. Defendant West is in the commercial aviation business at Ely, Minnesota, and serves the resorts named with air service. Repeated violations of the Executive Order by these defendants are fully established by the evidence. The only question pertains to the validity of the Executive Order as applied to these defendants, particularly as to the defendant resort owners, whose only means of ingress and egress to their properties outside of air service would be by way of canoe or boat in the summertime and by foot or snowshoe in the wintertime.

The Superior National Forest was established by the Government many years ago, and from time to time the boundaries have been enlarged. During 1927 or thereabouts, the then Secretary of Agriculture, in pursuance of the authority vested in him in the management of national forests, established the first Roadless Area in the Superior National Forest. These resorts are located therein. The section under which the Secretary proceeded is Section 551, 16 U.S.C.A.; which reads,

"The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside under the provisions of section 471 of this title, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations namely, to regulate their occupancy and use and to pre-

serve the forests thereon from destruction; * * *."

This first road ban regulation in the Superior National Forest was promulgated before there was any extended use of aircraft as a means of travel into remote recreational areas, and was prompted no doubt by a policy to preserve the unique character of this national forest which extends along the Canadian border for many, many miles. To the north of a substantial portion of the forest, Canada has established a national park. The general area constitutes one of the last wilderness areas in the United States. From the days of the voyageurs, it has been a canoe country, and the innumerable lakes and connecting streams with adjacent portages furnish an almost endless variety of trips by water. Perhaps no other place in the United States is so steeped in the lore of the Indian and fur trader, who traditionally used these waterways before the Northwest was settled. Public interest in the conservation of this area so that it might be retained in its primitive condition undoubtedly motivated the Secretary of Agriculture in establishing regulations so that the intrusion of automobiles and other vehicles would not destroy the unique recreational appeal of this Forest Reserve. The Roadless Areas have been augmented from time to time and now aggregate approximately one million acres. They are commonly known as Superior, Little Indian Sioux, and Caribou Roadless Areas. As indicative of the public interest and national concern for this region, reference may be made to the Shipstead-Nolan Bill, passed July 10, 1930, which withdrew any public land in this area from entry or appropriation, and which, in order to prevent the exploitation of any of the border water for power purposes and to preserve the shore lines of certain lakes and streams from indiscriminate logging, provided for stringent regulations in this regard. The following quotation from the House Committee Report reflects the concern for the need of preserving the unique primitive conditions in this national forest and the recognition of the recreational attractions for which it was peculiarly adapted,

"The bill designates an area in northern Minnesota along the Canadian border and within which is the Superior National Forest. It establishes a policy of conserving the natural resources of the designated area by providing that the remaining Federal lands within this area be withdrawn from entry and appropriation, and that the public lands and waters within this area may be used for the purpose to which they are best suited—namely, the preservation and reproduction of the forests, the preservation of its wonderful scenic beauties and conserving those natural resources for the benefit of the public; and that this policy may be effectively carried out, certain logging restrictions on shore lines of Government lands are prescribed. That the shore lines, rapids, waterfalls, timber, and other natural features may be preserved, further alteration of natural water level by any Government agency is prohibited without express authority of Congress.

"This area in Minnesota, combined with the Quetico Provencial Park in Ontario, comprises the greatest and most picturesque wilderness in the central part of the North American Continent. It is hoped that this region may ultimately become a great international recreational area to be used jointly by the people of these two countries, and thereby promote peace and better understanding. * * *

"The committee is of the opinion that the shore lines, rapids, waterfalls, beaches, and other natural features of this region, should be preserved in an unmodified state of nature, and that there should be no further alteration of the natural water levels of any lakes, channels, or streams abutted by Federal lands within, or bordering upon, the designated area unless sepcifically authorized by Congress. The committee does not feel that the private need and demand for the somewhat meager power resources of this region are at all commensurate with the public need, demand, and value for recreational

purposes requiring that these waterways be left in an unmodified natural state." House Report 1945, 71st Congress, 2nd Session, pp. 1, 6, 7.

The Shipstead-Nolan Bill is found in Section 577 et seq., Title 16, U.S.C.A. Section 577a provides, in part,

"The principle of conserving the natural beauty of shore lines for recreational use shall apply to all Federal lands which border upon any boundary lake or stream contiguous to this area, or any other lake or stream within this area which is now or eventually to be in general use for boat or canoe travel, and that for the purpose of carrying out this principle logging of all such shores to a depth of four hundred feet from the natural water line is hereby forbidden, except as the Forest Service of the Department of Agriculture may see fit in particular instances to vary the distance for practical reasons: * * *."

And with reference to the preservation of water levels, the Act provided in Section 577b,

"In order to preserve the shore lines, rapids, waterfalls, beaches, and other natural features of the region in an unmodified state of nature, no further alteration of the natural water level of any lake or stream within or bordering upon the designated area shall be authorized by any permit, license, lease, or other authorization granted by any official or commission of the United States, which will result in flooding lands of the United States within or immediately adjacent to the Superior National Forest, unless and until specific authority for granting such permit, license, lease, or other authorization shall have first been obtained by special Act from the Congress of the United States covering each such project: * * *."

In a report made to the Secretary of Agriculture with reference to the proposed management plan of the Superior Roadless Area, which was approved by him as of February 13, 1948, the following observation was made (Plaintiff's Exhibit 5, p. 29),

"B. Use of Aircraft

"It is generally recognized that the increase in the use of hydroplanes constitutes a critical threat to the qualities that make the areas outstanding. Were such use confined to travel to resorts and summer homes, it would not necessarily be too serious. However, there is a constantly growing plane traffic to and from all portions of the area that afford water surfaces adequate for landing and taking off. Thus, there is an increasing, and potentially unlimited, disturbance of the qualities of remoteness, quietness, and solitude that furnish much of the charm of the areas. The resulting pressures on fish population have already been mentioned. Much of the business involves but short visits to the areas, often but a day or less, and thus by-passes the resorts in the areas. It can be expected eventually to by-pass in large measure even the communities in adjacent areas. Although already given some study, authority for control over navigable waters not under the jurisdiction of the Forest Service is not yet clear, and as yet no concrete plan has been evolved. There is definite need for further and specific attention to this problem."

The defendant resort owners purchased the land and established their resorts after the particular area in which they are located was designated as a part of the Roadless Area of the Superior National Forest. And while there are in the Forest Reserve certain lands held by the State and other lands privately owned, the majority of the land is owned by the United States Government. From time to time, the Government has acquired additional lands by exchange or by purchase, and according to the report made to the Secretary of Agriculture in February, 1948, the Government owned about 74 per cent of the land acreage. And on June 22, 1948, in order to "protect and administer more effectively the publicly owned lands" in the Superior National Forest, Congress passed the so-called Thye-Blatnik Bill, which is found in Section 577c et seq., Title 16 U.S.C.A.

This bill was the second recognition by Congress of the necessity of preserving this wilderness area, and it authorized the Secretary of Agriculture to acquire private or state land in this area "where in his opinion development or exploitation, or the potentialities for development or exploitation, impair or threaten to impair the unique qualities and natural features of the remaining wilderness canoe country." Section 577c. Reference may be made to the following excerpt from the legislative history quoted from House Report 2186, 80th Congress, 2nd Session, anent the proposed Thye-Blatnik Bill,

"Establishment of the Wilderness Area

"In northeastern Minnesota adjacent to and extending across the international border into Canada is a land of lakes and forests so unique in its primitive beauty that its fame was established long before the white man set up his government on this continent. In 1930, for the purpose of reestablishing and preserving the primeval character of this region, Congress adopted the Shipstead-Nolan Act, setting aside part of the region as a wilderness-canoe area. The act recognized the unique beauty, the recreational values, and the inspirational worth of the lakes, rivers, and forests of this area and made their preservation the general policy of the United States.

"Pursuant to this act, the Forest Service set aside a tract of approximately 1,000,000 acres of this region as a 'roadless area,' one in which there should be no permanent roads. It also designated about 35 percent of the roadless area as a 'no cut' area, in which there are no commercial timber sales on national forest land. All of the area involved is within the Superior National Forest.

"Threat to the Wilderness Area

"Unfortunately, not all of the land within this special 'roadless' and 'no cut' area is in Federal ownership. About 70,000 acres are owned by the State of Minnesota and approximately 72,000 acres by private owners.

"It was the clear intention of Congress that there should be no commercial development of the ordinary resort type within the Shipstead-Nolan area and for several years the 'roadless' policy established by the Forest Service was effective in preventing commercial development of the private lands within the area. Since there were no roads, all building materials and supplies had to be brought into the area by canoe or back pack. This in itself was an effective barrier against the despoilation of the wilderness region.

"Within the past 2 or 3 years, however, development of the cargo-carrying airplane has completely altered this prospect. Cargo planes are now a well-established method of transportation and are daily becoming more common as carriers of freight. With this new means of transportation available, the lack of roads is no longer a barrier to the commercial development of private holdings deep within the wilderness area.

"Private Lands Should Be Acquired

"If the unique wilderness character of this region is to be preserved, the private holdings within the area must now be acquired by the United States. The action should be taken as expeditiously as possible. A delay of even one year will see additional private construction within the area with airborne materials, which will both detract from the public value of the region and increase the cost of later acquisition."

Congress made an appropriation to carry out the provisions of the Thye-Blatnik Bill, but the Act provided

"That under the authority of sections 577c–577h of this title no contiguous tract of land in one ownership, not exceeding five hundred acres in the aggregate, shall be condemned if on June 22, 1948, it is encumbered with a structure or structures of a permanent type suitable for human occupancy and if the owner thereof files written objections before expiration of the time

for answering the petition in the proceedings." Section 577c.

These resort tracts are less than five hundred acres in area.

Initially, at least, the Roadless Area as established by the Secretary of Agriculture resulted in the preservation of the charm and primitiveness of this wilderness region so that its recreational advantages had an unusual attraction to those who sought a retreat under such circumstances and conditions. No doubt the building of the resorts involved herein, which are located on the border waters between the United States and Canada, was motivated by the attraction that the Roadless Area afforded. In fact, one of the defendants' resort advertisements refers to the Roadless Area as the reason for the good fishing there, and expresses the hope that such conditions may continue, stating,

"I pray the good Lord daily that my camp remain roadless. Doubtless you are aware of what auto highways mean to good fishing—Amen."

All of these resorts began their operations when aircraft commenced to take hunters and fishermen to lakes far away from those recreational places which are usually reached by automobile. It was the Roadless Area which made these border lake resorts unique and attractive.

Executive Order No. 10092, which created the air ban involved herein, was issued in pursuance of the authority vested in the President by Title 49, U.S.C.A. § 174, which provides,

"The President is authorized to provide by Executive order for the setting apart and the protection of airspace reservations in the United States for national defense or other governmental purposes and, in addition, in the District of Columbia for public safety purposes. The several States may set apart and provide for the protection of necessary airspace reservations in addition to and not in conflict either with airspace reservations established by the President under this section or with any civil or military airway designated under the provisions of sec-

tions 171, 174–177, and 179–184 of this title."

It will be noted that such airspace reservations may be set apart by the President for national defense or other governmental purposes and, in addition, in the District of Columbia for public safety purposes. The question presented, therefore, is whether the preservation of this wilderness area by the restriction of airplane travel, as indicated in Executive Order No. 10092, is in furtherance of governmental purposes. The policy of the Government in preserving this region in its primitive state has been manifested by the various acts of Congress, committee reports, and the various regulations of the Secretary of Agriculture. The conservation of this wilderness tract is an outgrowth of years of government planning. Drastic curtailment of any exploitation by the use of the water therein for commercial purposes has been attained by congressional enactment. Public lands have been withdrawn from entry, and logging along certain waterways has been definitely restricted in order to "conserve the natural beauty of shore lines for recreational use." The Roadless Area was created by the Secretary of Agriculture in order to conserve the uniqueness of this region for the type of public recreation for which it was singularly adapted. That purpose and the general policy of the Government, as manifested in so many ways by congressional action and the legislative history, is now threatened by unrestricted airplane travel to and from that area. One of the effective barriers against the spoilation of the primitiveness of this canoe country was the establishment of the Roadless Area. This barrier, of course, will be circumvented entirely by the use of airplane travel, not only to the comparatively few resorts now located therein, but by airplane travel to and from the many lakes which will be used as landing fields for public and private air travel transportation.

But defendants urge that Section 174, Title 49 U.S.C.A., merely authorizes the President to establish air bans for national defense and for public safety in the District of Columbia. They urge that the

phrase "or other governmental purposes" refers to the purposes of, or in relation to, national defense, and they seek to apply the doctrine or rule of *ejusdem generis.* However, this rule of interpretation does not seem apposite in view of the language used in this Act. Generally, it may be stated that the rule may be utilized in interpretation when a general phrase is preceded by a series of specific words within a general class and the class is not exhausted by the enumeration. Here, the words "or other governmental purposes" are not preceded by a series of specific words within a general class. Here, the term "national defense" is sufficiently comprehensive in and of itself. It requires no further elucidation by the use of general terms. The term "national defense" is not rendered meaningless, nor is it in any way limited if the term "or other governmental purposes" is given its full and usual meaning. No good reason is suggested why Congress intended to limit the executive power to the creation of air bans solely for national defense. Indiscriminate flying and landing of aircraft in and about government operations other than those which are devoted to national defense might seriously hamper and prejudice governmental purposes; for instance, unrestricted flying and landing over and in the national parks, national game preserves, national bird refuges, and government works of various kinds. In any event, the Court should not construe the phrase "or other governmental purposes" as mere redundant surplusage and assume, in view of the language used, that Congress intended to limit narrowly the President's authority to create air bans solely for national defense. As stated by the court in Orme v. Atlas Gas & Oil Co., 217 Minn. 27, 40, 13 N.W.2d 757, 765, in discussing the rationale of the rule of *ejusdem generis,*

"* * * The rule should be applied cautiously and always with an eye to avoiding a construction at variance with the intention disclosed by the entire writing. The rule is not one of substantive law, but of construction, and is only an aid to the court in ascertaining the meaning of a writing."

See, also, James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155; Mason v. United States, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396.

There are brief provisions of the legislative history of Section 174, Title 49 U.S.C.A., which tend to support the interpretation suggested by the plaintiff herein. Apparently, this section originated in the House of Representatives, and in House Report No. 572, 69th Congress, 1st Session, the following statement appears,

"The airspace reservations proposed to be established are modeled upon principles of the International Air Navigation Convention and reservations for governmental purposes established by Executive Order under our public land laws."

In House Report No. 1162, 69th Congress, 1st Session, which is a conference report, we find the following statement by the house managers,

"The House amendment provided for the establishment and protection of airspace reservations for national defense and other governmental purposes and, in addition, in the District of Columbia for public safety purposes. No similar provision was included in the Senate bill. The substitute retains the House provision, and all air navigation within any airspace reservation is subject to the restrictions imposed by the Executive Order relating to such reservations."

And in discussing the conference report on the floor of the Senate, Senator Bingham said, p. 9355, 67th Cong.Report, Part 9, 69th Congress, 1st Session,

"So far as airspace reservations are concerned the President is authorized to provide by Executive Order for the setting apart and protection of airspace reservations for military, post offices, or other purposes."

Defendants earnestly urge that, if they are denied the right of access by air travel, their guests in effect will be denied any means of ingress and egress to their resorts. That the waterways, while avail-

able for canoe or boat, are subject to many limitations which would in effect relegate their resorts to isolated locations inaccessible to many of their guests, is quite probable. It may be that the effect of an air ban would be to discourage many people from patronizing these resorts in this wilderness area. But the right of these defendant resort owners, if any, by reason of the diminution of value of their resorts on account of the air ban is not before the Court. And any right of ingress and egress granted to actual settlers by Section 478, 16 U.S.C.A., will not avail the defendants in this controversy. They are accorded, of course, the right to cross the Forest Reserve, to travel by such trails and roads which may have been constructed thereon, and to utilize their properties under such rules and regulations as the Secretary of Agriculture has prescribed. There is nothing in the air ban which curtails such activities.

■ Defendants also emphasize the provisions of the Civil Aeronautics Act, Title 49 U.S.C.A. § 403, which provides,

"There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the navigable air space of the United States."

But that section, which is directed to the right of the public to have freedom of transit through the navigable airspace of the United States, must be subject to the paramount right of the Government to promulgate air regulations and air bans under its exclusive sovereignty in air space.

It may be noted that, under the Air Commerce Act of 1926, as amended in 1938, the United States assumed "complete and exclusive national sovereignty in the air space above the United States, including the air space above all inland waters". 49 U.S.C.A. § 176(a). As stated in United States v. Causby, 328 U.S. 256, 266, 66 S. Ct. 1062, 1068, 90 L.Ed. 1206. "The airspace, apart from the immediate reaches above the land, is part of the public domain."

The questions presented are novel and of first impression. Perhaps the most difficult question pertains to the authority of the Secretary of Agriculture in establishing Roadless Areas in this Forest Reserve. Such regulations were directed primarily to the preservation of this region for its unique recreational facilities. The purpose of establishing a Forest Reserve under the statute is to conserve the timber and water flowage within its boundaries for the citizens of the United States. Section 475, Title 16 U.S.C.A. The use of the forest for recreational purposes is incidental to this main purpose. It is urged, therefore, that any regulation by the Secretary which is directed to any purpose other than conservation of the timber and water resources is outside the purposes for which the national forests are established and hence unenforcible. See 23 Op.Atty.Gen., p. 589. But the authority of the Secretary of Agriculture over this Forest Reserve and the extent to which regulations may be promulgated by him with reference thereto, must be interpreted in light of the various enactments of Congress relating to this reserve and the settled practices and policy of the Government with respect thereto for over a quarter of a century. The Secretary's right under Section 551, Title 16 U.S.C.A., to regulate the "occupancy and use" of the Forest Reserve undoubtedly refers to the use and occupancy of those who are permitted to reside or to be upon the reserve. However, here Congress has clearly indicated by its policy that the use and occupancy of the Superior National Forest must be regulated so that the inherent primitiveness of the wilderness area may be preserved. And in promulgating the regulations establishing the Roadless Area, the Secretary has attempted to carry out that policy. It seems reasonably clear that Congress is clothed with authority to utilize a forest reserve as a recreational area for the citizens of this country as incidental to the paramount objects of maintaining the reserve as a national forest. Whatever the Secretary has done, therefore, with reference to the establishment of a Roadless Area seems entirely in

keeping with the furtherance of the governmental policy which Congress has adopted. Moreover, there is a presumption that there exist the basic facts which justify the issuance of such a regulation. See, King v. Edward Hines Lbr. Co., D.C., 68 F.Supp. 1019; Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 69, 57 S.Ct. 364, 81 L.Ed. 510; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138.

If it is recognized that the Secretary of Agriculture was authorized to issue the road ban regulation as to this area, and that such regulation, together with the various congressional enactments and pronouncements relating to the Superior National Forest, has established a governmental purpose and policy whereby this region is to be preserved for the people in its primitive wilderness state, then it seems to follow logically that the executive air ban should be sustained in that it is reasonably directed to the furtherance of governmental purposes.

The foregoing may be considered as the Court's findings of fact, and as conclusions of law the Court finds that plaintiff is entitled to an injunction permanently restraining said defendants, their agents and employees, from continuing in the future to fly airplanes, or to aid or abet in the flying of airplanes, under an elevation of four thousand feet above sea level within the confines of the airspace reservations as promulgated in Executive Order No. 10092, and from violating in any way. the provision of said Executive Order and the regulations of the Secretary of Agriculture promulgated thereunder.

A decree may be presented by the plaintiff in accordance herewith, with a provision, however, that a stay of sixty days be granted in order to afford the defendants reasonable time within which to arrange their affairs in the area subject to the air ban.

An exception is allowed.