EASTERN SUGAR ASSOCIATES (a Trust), Petitioners,. v. SUGAR BOARD OF PUERTO RICO, Respondent; RAFAEL APONTE SÁNCHEZ, Intervener.

No. 2. Argued March 2, 1953.—Decided November 5, 1954.

340

*Fiddler, González & Nido* for petitioners. *J. B. Fernández Badillo, Acting Attorney General,* and *A. Torres Braschi, José E. de Guzmán* and *Federico Rodríguez Gelpí* for the respondent Board. *Rodolfo F. Aponte* for the intervener.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

This case involves the meaning and constitutionality of the provision in § 6 (*a*) of the Sugar Act of Puerto Rico—Act No. 426, Laws of Puerto Rico, 1951—that "The central shall be bound to provide gratuitously to all its *colonos* hoisting service and the necessary personnel for the operation thereof at each point designated by the central for the delivery of cane."

The above-quoted portion of § 6 (*a*) must be read in its setting. Section 6 establishes the terms and conditions for the transportation and hauling of colono cane. Section 6 (*a*) provides that if the central furnishes the means of transportation for colono cane from the farm to the central, the central shall pay the colono as compensation for hauling expenses

7½ cents per ton of cane. If the central does not provide such means of transportation, it must compensate the colono as established thereafter in § 6(b) and (c) for the transportation of cane from the farm to the point of delivery designated by the central. Section 6(a) then sets forth the sentence in controversy here: "The central shall be bound to provide gratuitously to all its *colonos* hoisting service and the necessary personnel for the operation thereof at each point designated by the central for the delivery of cane."

Section 6(b) provides that if a colono transports his cane, the central shall pay the colono as compensation for hauling expenses 15 cents per ton of cane, plus 5¢ for each ton per kilometer, from the farm to the point of delivery.

Section 6(c), as we have seen in *Antonio Roig Sucrs.* v. *Sugar Board,* decided today, provides that if portable tracks have been used by the central for the transportation of colono cane, these tracks and the necessary rolling material must be furnished to the colonos without cost; in addition, under these circumstances the central must pay the colono 5 cents per ton of cane as hauling expenses.[1]

---

[1] In view of the importance of reading all the terms of § 6 together, we quote it verbatim in this footnote.

"Section 6.—The following terms and conditions shall govern the transportation and hauling of the colono's cane:

"(a) The central may provide means for the transportation of its *colono's* cane from the *colono's* farms to the central, and when such means is so provided, the central shall pay to the *colono* seven and one-half (7-½) cents on each ton of cane delivered, as compensation for hauling expenses; *Provided,* That if during the grinding season of 1950 any central has paid a higher amount for such expenses, the latter shall be the governing rate for said central. In case the central does not provide such means of transportation, it shall be bound to compensate the *colono* in the manner and to the extent hereinafter established, for the transportation of said cane from the *colono's* farm to the point of delivery designated by the central, whether such transportation is made with equipment belonging to the *colono* or leased by him. The central shall be bound to provide gratuitously to all its *colonos* hoisting service and the necessary personnel for the operation thereof at each point designated by the central for the delivery of cane. In the case of a new *colono,* or one who desires to change the point of delivery of the cane, and the central and the *colono* do not reach an understanding as to the point of delivery, the Board shall determine the point

The central involved herein makes two contentions. It first argues that its action in designating the patio of the mill as the point of delivery was valid under § 6, despite the fact that it actually accepts cane from its colonos at an intermediate point and transports such cane from that point to the mill without cost to the colonos on a railroad belonging to the central. The significance of this argument is that if we agree with the mill that under these circumstances the mill was properly designated as the point of delivery, the central may be required under § 6 to furnish free hoisting service and personnel therefor only at the mill, as the point of delivery, and not at the intermediate point.

The second contention of the central is made in the event we disagree with it on the first point and hold instead that under § 6 the point of delivery is where the mill physically receives colono cane at the intermediate point. The central argues that § 6(a) as thus interpreted is violative of local and Federal due process insofar as it requires the mill to furnish gratuitously the personnel for hoisting services at the point of delivery.

Eastern Sugar Associates, hereinafter called the As-

---

where the central shall receive the cane of the *colono* from among the ones designated by the central.

"(b) In those cases where the *colono* transports his cane, the central shall compensate him at the basic rate of fifteen (15) cents for each ton of cane transported, as hauling expenses, plus the sum of five (5) cents for each ton per kilometer, from the farm to the point of delivery, provided the distance to be covered from the farm to the point of delivery is one-half kilometer or more; *Provided,* That the *colono* shall be entitled to receive the basic compensation of fifteen (15) cents even if the distance to be covered from the farm to the point of delivery is less than one-half kilometer. For the purpose of this compensation, the distance shall be determined from the normal or natural exit in the colono's farm where the cane was cut, to the point of delivery designated by the central. If upon determining the weight and the distance in the transportation and hauling of the cane, there results a fraction of a kilometer or of a ton, a proportional compensation shall in both cases be paid for such fraction.

"(c) In those cases where portable tracks have been used by the central for the transportation of a *colono's* cane, the central shall be bound to furnish to the *colono*, without any cost whatsoever to the *colono*, the said portable tracks and the necessary rolling material; and it shall also be

sociates, are engaged in the growing of sugar cane and the processing thereof, and in the processing of cane of numerous colonos. The Associates own and operate a railroad upon which their own cane is transported to their mills, and on which they also transport cane of colonos without cost to the latter. The sugar cane of some of its colonos—including Rafael Aponte Sánchez, the complainant in this case—is loaded in railroad cars of the Associates at a siding at a place known as Eugui for transportation to their Santa Juana mill.

At Eugui the cane is lifted from the ground by a crane with an arm that swings to a point over the railroad car where the cane is dropped into place in the car. The men who operate the crane—which belongs to the Associates—and the man who stands in the car to see that the cane is properly located in the car are employees of the Associates who pay their wages. The controversy in this case does not involve these employees. Rather it involves the payment of the wages of another man who uses a rope to control the arm which swings the cane to the proper point over the car. This man is called the "soguero" or rope-man. In the past his wages have been paid by Aponte.

---

bound to pay to the *colono*, as hauling expenses, five (5) cents for each ton of cane. The central may discontinue the practice of furnishing to its *colonos*, either directly or through any subsidiary entity, agent or contractor, portable tracks, provided it obtains the approval of the Board to do so. The Board shall be empowered to order any central to discontinue the use of any transportation system which, in the judgment of the Board, may be prejudicial to the interests of the *colonos* or of the industry.

"(d) The compensation hereinabove provided for transportation and hauling, shall be paid weekly by the central.

"(e) The centrals shall be liable to the *colonos* for the cane of the latter from the time it is received by them at the point of delivery designated by the central, except in cases of force majeure, or for reasons beyond the control of the central.

"In no case shall the central be under obligation to pay more than one dollar for transportation and hauling.

"With respect to the canes of the island of Vieques which are transported to Puerto Rico, insofar as hauling and delivery is concerned, the provisions of the Public Service Commission for the 1951 grinding season shall be maintained, until the Board, after hearing the parties, provides otherwise, which provision shall then govern."

On April 7, 1952 Aponte filed a complaint before the Sugar Board requesting that the Associates be required to reimburse him for the wages paid by him to the rope-man and to pay the latter's wages in the future. The Associates answered this complaint. After a hearing at which the parties presented a stipulation of facts and testimony, the Board entered an order requiring the Associates to reimburse Aponte for the wages he had paid the rope-man and to pay his wages in the future.[2] The Associates thereupon filed a petition for review of the order of the Board under § 33 of Act No. 426.

We examine first the problem of the meaning of the provision in § 6 that the central shall designate the point of delivery for colono cane and its application to the facts of this case. The Associates contend that under § 6 the central is authorized to designate the point of delivery of colono cane; that they designated their Santa Juana mill as the point of delivery for Aponte's cane; that they furnish hoisting service and the necessary personnel at the mill, which is the point of delivery designated by them, as required by § 6(a); and that they cannot be required to pay the rope-man who works for Aponte at Eugui, which is not the point of delivery designated by the central.

In support of their contention that the mill was the point of delivery in this case, the Associates presented in evidence three letters, dated November 28, 1951, which they wrote to Aponte in connection with the transportation of cane from his three farms. These letters were identical except for the statements therein as to the distance from each farm to Eugui. The first paragraph of these letters reads as follows: "In order to determine the payment for hauling by truck of the cane of our colonos for the 1952 crop, in accordance with the new basic rate of 15¢ plus 5¢ per kilometer and proportionately for a fraction of a kilometer,...we have undertaken to

[2] We assume that the terms of this order apply as of the effective date of Act No. 426.

make a study of the distances from the normal or natural exit of the farms of each colono to the normal points of delivery."[3]

The second paragraph of the letters from the Associates to Aponte, after giving the exit from the particular farm involved and the distance therefrom to the loading station at the Eugui siding, said the following: "From that point, the transportation to *the point of delivery, which will be the Central where the cane is weighed,* will be on the railroad of the Associates." (Italics ours). The letter concluded by advising Aponte that if he made no observations thereon within ten days, it would be understood that he accepted "this distance as correct and the resulting compensation according to the new rate."

Section 6 provides that the point of delivery of colono cane shall be designated by the central. The Associates designated its Santa Juana mill as the point of delivery for Aponte's cane. However, it took physical delivery of his cane at Eugui as it had done in the past. The Board held that § 6 authorizes a central to designate the point of delivery of colono cane; but that if as in this case the central in fact takes physical delivery of the cane from the colono at an intermediate point, under § 6 the latter is the point of delivery. It therefore held that the rope-man involved herein was employed at the point of delivery and that consequently his wages must be paid by the Associates under the provision in § 6 that the central shall provide at the point of delivery hoisting services and the personnel therefor without cost to the colono.

---

[3] The Associates apparently were endeavouring to comply with § 6(b) which, after establishing the basic 15-cent rate plus 5 cents for each ton per kilometer from the farm to the point of delivery, provides: "For the purpose of this compensation, the distance shall be determined from the normal or natural exit in the *colono's* farm where the cane was cut, to the point of delivery designated by the central. If upon determining the weight, and the distance in the transportation and hauling of the cane, there results a fraction of a kilometer or of a ton, a proportional compensation shall in both cases be paid for such fraction."

When a colono transports cane, he may deliver it either (1) to an intermediate point or (2) to the mill. But § 6 nowhere speaks of transportation by the colono to the mill as such; it invariably uses the phrase "point of delivery" and nothing more. It follows that the phrase "point of delivery designated by the central" as used in § 6 covers both contingencies: the point of delivery may be either the mill or an intermediate point, depending on the facts of each case.[4]

■ We must therefore determine what point of delivery was designated by the central in this case. Under § 6 the Associates were entitled to designate their Santa Juana mill as the point of delivery for Aponte's cane. They contend

---

[4] There are a number of indications in § 6 that the Legislative Assembly envisaged the possibility that there would be delivery points in addition to the mill. Section 6(a) requires the mill to provide hoisting service ". . . at each point designated by the central for the delivery of cane." It is true that this would include a case where an entity owned more than one mill; but it would also cover the situation of an entity which operated only one mill with more than a single point of delivery. Section 6(a) also gives the Sugar Board power under certain circumstances to determine a point of delivery ". . . from among the ones designated by the central."

Section 6(b), in referring to the distances for which the colono is compensated for transportation and hauling expenses, in every instance speaks of the distance from the farm to the "point of delivery", never to the central as such.

Section 6(e) establishes the responsibility of the central to the colonos for their cane ". . . from the time it is received by them at the point of delivery designated by the central...". If the mill alone were the point of delivery, this provision would be superfluous: the central would obviously be responsible for colono cane after it took delivery at the mill.

Finally, cranes at the mills are owned and operated by the central. It would have hardly been necessary to provide for free hoisting service at points of delivery if it had been contemplated that under § 6 the only point of delivery would be the mill. Colonos de Caña de Santa Juana v. Sugar Board, No. 6, decided today.

In providing for points of delivery in addition to the mill, § 6 followed the historical pattern. See § 7 of Act No. 112, Laws of Puerto Rico, 1937, as amended by Act No. 213, Laws of Puerto Rico, 1938.

We point out in Colonos de Caña de Santa Juana v. Sugar Board, No. 6, decided today, that in providing in § 6 for free hoisting service at the points of delivery, the Legislative Assembly focused its attention primarily on intermediate sites and only incidentally on the mills as such points of delivery.

that it was so designated in their letters of November 28, 1951. The difficulty with this contention is that these same letters and the acts of the parties pursuant thereto show the contrary.

The letters advised Aponte that as in the past the Associates would take physical possession and control of his cane at Eugui. And that is what actually occurred during the 1952 crop year. Aponte transported the cane from his three farms to Eugui, where the Associates, by means of a crane owned and operated by the Associates, proceeded to take physical possession of the cane and to transport it to their Santa Juana mill on their own railroad.

Under these circumstances we cannot hold that the central designated its mill as the point of delivery. On the contrary, when a mill as here designated an intermediate point at which it will take physical possession and control of colono cane, to be thereafter transported by it to the mill for its own account, it has for the purposes of § 6 designated the intermediate site as the point of delivery. The mill may not make all the physical and legal arrangements for delivery at an intermediate site and then simply by a legal fiction which does not correspond to the facts label another place—the mill—as the point of delivery for the purpose of avoiding its obligation under § 6 to furnish its colonos free hoisting service and personnel at the place where the colono in fact delivers his cane to the central. The provision of § 6 for free hoisting and personnel service at the point of delivery cannot be so easily frustrated.

The fact that the cane is not weighed until it reaches the central is not incompatible with the concept that delivery as defined in § 6 has been effected at an intermediate point. The statute clearly contemplates the possibility that points of delivery in addition to the mill may be designated by the central. Section 6 so provides despite the well-known fact that colono cane is weighed at the mill. And there is nothing in § 6 which requires a delivery point to be a place where

cane is weighed as well as delivered. Section 6 therefore means that where cane is delivered at a loading station, it is delivered subject to a subsequent determination of its weight.

The primary purpose of § 6 is to establish the compensation to the colono for transportation and hauling expenses. The letters from the Associates to Aponte were principally concerned with that problem. The Associates set forth in these letters their estimates of the distances from Aponte's three farms to Eugui in order to facilitate the calculation of the compensation to which Aponte was entitled as transportation and hauling expenses at the rate of 15 cents per ton plus 5 cents a ton per *kilometer* as provided in § 6 (*b*). See footnote 1 and text of opinion preceding it. The Associates did not include the distance from Eugui to the mill for purposes of calculating the said compensation. This was on the basis that the mill took delivery of the cane at Eugui and thereafter transported the cane on its own railroad at its own expense. But this only serves to emphasize the realities of this case: the point of delivery, for purposes of § 6, which deals primarily with compensation of colonos for transportation and hauling expenses, was in fact and law Eugui, not the Santa Juana mill.[5]

■ Section 6 does not necessarily require any formal designation of points of delivery by the central, either in writing or orally. The conduct of the parties utilizing in fact either the mill or any intermediate site as the point of delivery would be sufficient in order to make the terms of § 6 applicable to the transaction. By the same token, a designation by letter of a point of delivery contrary to the facts has no legal effect. Under § 6 what the parties do, not what

[5] To call the intermediate point where the mill in fact receives colono cane the point of delivery is not unknown in Puerto Rico. *Cf.* § 7 of Act No. 112, Laws of Puerto Rico, 1937, as amended by Act No. 213, Laws of Puerto Rico, 1938; *Bowie* v. *González*, 117 F.2d 11 (C.A. 1, 1941), where, in discussing a different problem, the court speaks at p. 15 of mills of the Associates which "...accept delivery..." of colono cane at "...points outside the mill..."; *Calaf* v. *González*, 127 F.2d 934, 937 (C.A. 1, 1942).

they say, is controlling.   See *Vélez* v. *San Miguel*, 68 P.R.R.
534, 542.   *Cf. González* v. *Bowie*, 123 F.2d 387, 389–90 (C.A.
1, 1941), for language used in examining a different problem
under a different statute but which we think supports our
view.

■ The Associates argue that their function "...as pro-
vided in the statute, is to grind the cane of colonos at its
mill or mills and to pay the colono the percentage of sugar
and molasses fixed for that service.   In the very nature of
things, this function does not begin nor can it begin until the
cane is delivered into the conveyor of the mill.   The loading
and the hauling of the cane to the mill are preliminary to
the grinding process and not a part of it.   No manufactur-
ing process begins or can begin until the raw material arrives
at the manufacturing plant.   How it arrives there is im-
material to the manufacturing process."

The foregoing paragraph is another way of making the
argument which we have rejected in *Antonio Roig Sucrs.* v.
*Sugar Board*, decided today, that the sugar industry is divided
into two airtight compartments—agricultural and industrial
—and that the Legislative Assembly cannot regulate the
sugar industry as a whole on an over-all basis.   Moreover,
to assert as the Associates do that the function of the mill
"...as provided in the statute, is to grind the cane of colonos
...and to pay the colono..." therefor is to act as though
§ 6 is not a part of Act No. 426.   Provided § 6 is constitu-
tional, we cannot so easily read it out of the statute.

■ Finally, the Associates argue that hoisting precedes
and is not even a part of transportation;  that since they
grind the cane of Aponte and other colonos on a toll basis
they never take title to colono cane and are only bailees for
the purpose of processing it, *cf. Commissioner of Int. Rev.* v.
*San Carlos Milling Co.*, 63 F.2d 153, 155 (C.A. 9, 1933) ; and
that they merely act as the agent of the colono in transport-
ing his cane from Eugui to the mill, which is therefore the

point of delivery. These contentions do not convince us for various reasons. But the shortest answer to them is that the terms of § 6(a) require the mill to furnish free hoisting service and personnel at points of delivery; and, as we read § 6(a), as applied to the facts of this case, Eugui was a point of delivery for Aponte's cane.

The fact that Aponte did not make any observations on the letters of November 28, 1951 within ten days as required by paragraph three thereof does not alter our conclusion. In the first place, these letters were concerned primarily with compensation to the colono for transportation and hauling expenses and referred to the point of delivery casually and somewhat indirectly. Secondly, Aponte was asked to comment only on the estimates of the distances from his farms to Eugui for purposes of compensation. His silence was presumably confined to agreement with these estimates. But more important than these two points is the provision in § 34 of Act No. 426 that any contract or practice contrary to the statute or orders or regulations of the Board shall be void. Consequently, even if we assume that a contract was made by virtue of the letters, it would be void as applied to the facts of this case because in conflict with § 6 as hereinbefore interpreted by us with reference to points of delivery.

We hold that under § 6(a) the Associates are required in this case to furnish Aponte with free hoisting services and personnel at Eugui as the point of delivery. This includes paying the wages of the rope-man. We turn to the contention of the Associates that as thus interpreted § 6(a) violates local and Federal due process of law.

In attacking the constitutionality of the provision of § 6 requiring the mill to furnish free hoisting service at points of delivery, the Associates would have us read that portion of § 6 isolated from the rest of Act No. 426. They insist that the compensation to the colono is "fully covered" by § 5, and that § 6 requires them to perform or pay for

services "...which are no part of the manufacturing process." But as we pointed out in *Antonio Roig, Sucrs.* v. *Sugar Board*, and *Eastern Sugar Associates* v. *Sugar Board*, No. 3, decided today, §§ 5, 6 and 7 must be read together as providing the over-all compensation to colonos. Only if the testimony showed that these Sections, read together, resulted in a confiscatory participation for the central would any of them be violative of due process. And no such testimony was offered here or in any of these cases.

In their reply brief the Associates assert that the operator of a mill "...must take the fixed payments under Article 6 whether he operates at a profit or not,—whether it depletes his capital or not,—whether the factories on which the colono depends for processing his product can be maintained or not, —and regardless of the market price of his share of the sugars from which he must make the payments."[6] The record contains no evidence that the impact of § 6 would result in losses to the Associates, depletion of their capital, or the closing of their mills. We are not entitled to speculate that Act No. 426 would have such economic effects in the absence of testimony to that effect. The burden is on the Associates to show that § 6 as applied to them is confiscatory. They have not done so. See *Pacific States Co.* v. *White*, 296. U. S. 176, 185–6; *U. S.* v. *Carolene Products Co.*, 304 U. S. 144, 152–4; *Clark v. Paul Gray, Inc.*, 306 U. S. 583, 594; *Kovacs* v. *Cooper*, 336 U. S. 77, 89–95, concurring opinion of Mr. Justice Frankfurter; *Dennis* v. *United States*, 341 U. S. 494, concurring opinion of Mr. Justice Frankfurter at pp. 525 *et seq.*; *Salsburg* v. *Maryland*, 346 U. S. 545, 553; *Postley* v. *Treasurer*, 75 P.R.R. 822, 842, footnote 13.[7]

---

[6] In making this argument, the Associates apparently concede what we have noted in the *Roig* case, decided today—the colono "depends for processing his product" on the mill.

[7] This was a case where the order of the Board had an individual impact on the Associates. They were therefore entitled to and received a quasi-judicial hearing before the Board on the controversy herein. *Eastern Sugar Associates* v. *Sugar Board*, No. 3, decided today. At this

The Associates also argue in their brief that "It would be just as logical to provide that the processor must gather the cane in the field, or must cut it, or must cultivate it and pay for the fertilizer." Since Act No. 426 contains no such provisions, we fail to see how that argument requires us to hold that the provisions it does contain make § 6(a) with reference to hoisting service and personnel confiscatory. See *Ballester* v. *Court of Tax Appeals*, 61 P.R.R. 460, 487, 493, affirmed in 142 F.2d 11 (C.A. 1, 1944), cert. denied in 323 U. S. 723.

The Legislative Assembly undertook in Act No. 426 to regulate the sugar industry in Puerto Rico as a whole. This was a valid approach. *Antonio Roig, Sucrs.* v. *Sugar Board* decided today. Consequently, we cannot accept the argument that the Associates are engaged only in the manufacturing or industrial phase of the sugar business, and that to require them to furnish hoisting service at a point of delivery is to force them to make a gift to a person engaged in a different branch of the industry.

We find nothing in the cases cited by the Associates which would require us to hold that the provision in § 6 for hoisting service at points of delivery violates the local or Federal due process clause.[8] For the reasons stated (1) in this opinion, (2) in *Antonio Roig, Sucrs.* v. *Sugar Board*, decided today,

---

hearing they did not avail themselves of the opportunity to show if they could by testimony that as applied to them the provision of § 6(a) as to hoisting service, when read together with the rest of Act No. 426, would result in losses or insufficient profits for the Associates. *Antonio Roig, Sucrs* v. *Sugar Board*, decided today.

[8] The Associates, in making their argument as to constitutionality, rely on *Loan Association* v. *Topeka*, 87 U. S. 655; *Lowe* v. *Harris*, 112 N. C. 472 (1893), as reported in 22 L.R.A. 379, 381; *Missouri Pacific Railway* v. *Nebraska*, 164 U. S. 403, 417; *Thompson* v. *Consolidated Gas Co.*, 300 U. S. 55, 80; *Ex Parte Goodrich*, 160 Cal. 410, 420 (1911); *Gt. Northern Ry.* v. *Minnesota*, 238 U. S. 340; *In Re Opinion of the Justices*, 14 N. E. 2d 392 (Mass., 1938); *Louisville &c. R. R. Co.* v. *Stock Yards Co.*, 212 U. S. 132; *State* v. *Harris*, 6 S. E. 2d 854 (N. C., 1940). The latter case, and the other state cases cited, are inapplicable and in any event are not binding on us.

354

·and (3) in *Eastern Sugar Associates* v. *Sugar Board*, No. 3, decided today, we find no constitutional infirmity in the said provision.

The order of the Sugar Board will be affirmed with costs and expenses imposed on the petitioners pursuant to § 33 of Act No. 426.

Mr. Justice Ortiz and Mr. Justice Sifre did not participate herein.